Filed 7/2/24  P. v. Mundy CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>STANLEY MUNDY,<br><br>    Defendant and Appellant. | C093498<br><br>(Super. Ct. No. 17FE010289) |

Defendant Stanley Mundy committed acts of rape, sodomy, and oral copulation against his stepdaughter, R. Doe (R.),[1] beginning when she was about 12 years old and continuing for several years.  He also committed lewd and lascivious acts against his daughter, A. Doe (A.), beginning when she was nine years old and ending when she was

---

[1]     We refer to the victims and minor witness by their first initial and Doe in place of their last name.  (Cal. Rules of Court, rule 8.90(b)(4), (9)).

A jury found defendant guilty on all counts of a 15-count information and the trial court sentenced him to an aggregate term of 99 years in state prison.

On appeal, defendant argues that his convictions must be reversed: (1) because, based on the outcome of a prior juvenile dependency proceeding, this prosecution was precluded by double jeopardy principles, Penal Code section 654,[2] and collateral estoppel; (2) due to prejudicial precharging delay between when R. reported defendant's crimes in 2013 and the filing of charges in 2017; (3) based on the trial court's erroneous exclusion of (a) a statement made by R. to her then-boyfriend that she was a "virgin" and (b) testimony by experts in the field of document examination; and (4) because the trial court improperly denied his motion for a mistrial based on the months-long suspension of trial proceedings due to the COVID-19 pandemic. Defendant also asks that we independently review the record of the trial court's in camera review in response to his *Pitchess* motion (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*)). Finally, defendant asserts that the sentences imposed on counts three and four are unauthorized as ex post facto laws because they exceed the statutory upper terms at the time of his offenses, and that the imposition of upper term sentences did not comply with statutory requirements following the amendment of section 1170 by Senate Bill No. 567 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 731).

We will vacate defendant's sentence and remand for a full resentencing. We otherwise will affirm.

## BACKGROUND

An amended information filed on June 17, 2020,[3] charged defendant with committing a lewd or lascivious act on a child, R., under the age of 14 years (§ 288, subd.

---

[2]    Undesignated section references are to the Penal Code.

[3]    The original felony complaint was filed on June 5, 2017.

(a); counts one and two), committing a lewd or lascivious act on a child, R., under the age of 14 years by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury (§ 288, subd. (b)(1); counts three and four), rape of R. by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury (§ 261, subd. (a)(2); counts five, ten and twelve), sodomy of R. by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury (§ 286, subd. (c)(2); counts six and nine), oral copulation of R. by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury (former § 288a, subd. (c)(2); counts seven and eight), attempted oral copulation of R. by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury (§ 664, former § 288a, subd. (c)(2); count eleven), and committing a lewd or lascivious act on a child, A., under the age of 14 years (§ 288, subd. (a); counts thirteen through fifteen).

*The Trial—Relevant Portions of the Prosecution Case*

*Sexual Abuse of R.*

When R. was eight years old, her mother, Shannon M. (Shannon),[4] began a relationship with defendant. Defendant and Shannon married when R. was 10 years old, and, around that time, A. was born. R.'s stepbrother (and A.'s brother), D. Doe (D.), was born a year later.

When R. was approximately 12 years old, defendant began to sexually abuse her. On the first occasion, he woke R. and took her to a bus they were converting into a recreational vehicle. On the bus, defendant had R. pull her pajama pants down and sit on his lap, and then had her lay down on a couch. Defendant, kneeling on the floor, took his penis out and put it inside R.'s vagina.

---

[4] We refer to the witness by first name and last initial. (Cal. Rules of Court, rule 8.90(b)(10)).

On another occasion, when R. was 13 years old, she asked permission to go to a friend's birthday party. Shannon and defendant said they would think about it. Defendant later approached R. and told her that if she wanted to attend the party, she had to perform a "favor." The favor, which again took place on the bus, consisted of defendant placing his penis in R.'s vagina.

On another occasion, defendant had R. put her arms on top of the clothes dryer in the garage and he pulled her pants down. Defendant penetrated R. anally with his penis.

Another time, R. sought permission to go out with friends. Defendant told her she would have to do something for him. Defendant had her lay on the couch and he penetrated her vagina with his penis. Defendant then allowed her to go out.

On another occasion by the clothes dryer, defendant anally penetrated R. and then had her perform oral sex. R. "was not given a choice." Defendant vaginally penetrated R. while she had her hands on the clothes dryer on one occasion and another time while she had her hands on the washing machine. R. also recalled instances of anal and vaginal penetration occurring in the bathroom. R. estimated she performed oral sex on defendant more than 15 or 20 times, and there were times when he performed oral sex on her.

Months after the sexual abuse began, R. confronted defendant and told him that what he was doing was "not okay." Defendant told R. that if she told her mother, she would be angrier with R. than with him. He also told her that Shannon finally had the family she always wanted, and asked R. why she would "take that away from her. And did [R.] want [her] brother and sister to grow up without a dad like [R.] did."

R. tried refusing to perform the sexual acts, but none of R.'s "small acts of defiance" worked, leaving her feeling "defeated. Hollow. Nothing." R. felt she had no choice. She did not want her siblings to grow up without a dad, and she did not want Shannon to lose financial stability. So, seeing no alternative, R. "just kind of, . . . went with it."

4

One night, defendant had R. lay on the couch with her pants down and was preparing to perform oral sex on her when R. heard Shannon's voice from another room. R. jumped up, dressed quickly, and went to her mother in her bedroom. Shannon asked what was going on and R. responded, "What do you think?" By this time, R. was "just done and tired and angry and desperate." Shannon, apparently understanding R.'s meaning, grew angry at defendant and threw a bottle of vodka at him. Then she retrieved a gun. She pointed it first at defendant and then at herself. R. managed to persuade her mother to give her the gun.

Sometime later, R. and Shannon got in a car to go to the police station. However, Shannon pulled into a parking lot and they talked. R. testified that her mother talked her out of reporting the sexual abuse, and that "there were times after where I wanted to report and she begged me not to."

At one point, defendant told R. the abuse would stop if she wrote a letter recanting her allegations. Defendant had drafted a letter in a notebook, and he instructed R. to copy his letter verbatim. R. complied.

The sexual abuse continued.

In 2012, one week before R.'s 17th birthday, defendant entered her bedroom while she was sleeping, removed her clothing, and had vaginal intercourse with her.

In May 2013, R. attended her senior ball with a coworker she was dating and, afterward, the coworker spent the night at R.'s house. The next morning, R. confronted defendant about why he asked her young stepsister A. to check on whether R. had an overnight guest. Defendant and R. argued, defendant called R. a liar, and "that was kind of [R.'s] breaking point." The following day, May 13, 2013, R. filed a report with the Sacramento County Sheriff's Department.

*Sexual Abuse of A.*

A. testified that, on one occasion, she, her brother, and defendant were sitting on the couch watching a movie when defendant touched the side of her breast. A. initially

5

thought it was possible defendant accidentally touched her breast. However, she realized it was not an accident when he touched her inappropriately on other occasions. Defendant would touch her breast and her crotch over her clothing. On one occasion, he came into her bedroom, sat next to her on the bed, and touched her crotch for a couple of seconds (A. initially misremembered this incident as defendant touching her breast). On another occasion, A. was at the kitchen sink when defendant approached her from behind and placed his hand on her crotch.

These incidents began when A. was nine years old and ended when she was 11, when she reported them. A. first told two friends, and then her school principal. The sheriff came to her school and later a Special Assault Forensic Evaluation interview was conducted with A., a video recording of which was played for the jury.

### *The Trial—Relevant Portions of the Defense Case*

A.'s brother D. testified that he did not remember seeing anyone being touched inappropriately. He did not remember any incident involving A. being inappropriately touched while they were watching a movie.

Shannon testified that one evening in 2013, R. told her defendant had been touching her for four years. Shannon yelled at defendant and threw a bottle at him. Defendant denied any wrongdoing. Shannon retrieved her gun, loaded it, pointed it at defendant, and then turned the gun on herself. R. persuaded Shannon to give her the gun.

Shannon and R. started driving to the police station. According to Shannon, before they arrived, R. decided against reporting the matter. R. "basically" told Shannon she had lied and that she had been angry. However, Shannon acknowledged that she influenced R. not to report the matter.

### *Verdict and Sentencing*

The jury found defendant guilty on all counts. The trial court sentenced defendant to 99 years in state prison, consisting of the upper term of eight years on count one, two years (one-third the middle term) on count two, the upper term of 10 years on counts

6

three and four, the upper term of eight years on counts five through nine, the upper term of 11 years on count ten, the middle term of one year on count eleven, the upper term of 11 years on count twelve, and two years each, one-third the middle term, on counts thirteen through fifteen.

DISCUSSION

I

*Preclusive Effect of Prior Juvenile Dependency Proceeding*

Before trial, defendant moved to dismiss the counts involving R. on the grounds that they were barred by collateral estoppel. Not long after R. reported defendant's sexual abuse to the Sacramento County Sheriff's Department in May 2013, a petition was filed in a juvenile dependency court under Welfare and Institutions Code section 300. The juvenile dependency petition alleged that A. and D. were in danger as a result of defendant's sexual abuse of R. (See Welf. & Inst. Code, § 300, subds. (d), (j).) In March 2014, the juvenile court found the evidence insufficient to support jurisdiction under the statute, and the petition was dismissed.[5] The trial court denied defendant's motion, concluding that the prior dependency proceeding did not foreclose criminal prosecution.

Defendant subsequently moved to dismiss on double jeopardy grounds. He asserted that, in the dependency proceeding, he had been "acquitted" of R.'s allegations, and therefore he could not be prosecuted again for the same offenses. The trial court again denied defendant's motion, concluding that "the [juvenile] court's failure to sustain the petition in a dependency proceeding[] does not equate to an exoneration under the

---

[5] When asked for the basis of its ruling, the juvenile court judge said: " 'I didn't believe [R.]. There were too many inconsistencies; too much scientific evidence that went against her. For instance, the handwriting analysis, her motive, and I just don't think, listening to this young lady, that she's a lady that would have suffered for all that time in silence. I just don't believe it.' "

law," and because "dependency proceedings are not criminal prosecutions . . . the [d]ouble [j]eopardy limitation does not apply."

On appeal, defendant argues that the trial court erred in denying his motions to dismiss counts one through twelve because R.'s allegations had previously been resolved in his favor in the juvenile dependency proceeding. Defendant asserts these counts should therefore have been dismissed based on double jeopardy principles, pursuant to section 654, and based on collateral estoppel.

A. *Double Jeopardy*

Defendant argues that the allegations of sexual abuse in the 2013 dependency proceedings required proof of the same conduct underlying counts one through twelve of the amended information so as to trigger double jeopardy protections. According to defendant, the juvenile court's findings in the dependency proceedings that R.'s allegations were not credible constituted a judicial determination that the proof of defendant's misconduct against R. was insufficient, and thus amounted to an acquittal for double jeopardy purposes.

"The double jeopardy clauses of the Fifth Amendment to the United States Constitution and article I, section 15, of the California Constitution provide that a person may not be twice placed 'in jeopardy' for the 'same offense.' 'The double jeopardy bar protects against a second prosecution for the same offense following an acquittal or conviction . . . .' " (*People v. Anderson* (2009) 47 Cal.4th 92, 103-104; see §§ 656, 793.) " 'The constitutional protection against double jeopardy unequivocally prohibits a second trial following an acquittal.' " (*Anderson*, *supra*, at p. 104.) "Generally, a defendant bears the burden of establishing facts showing that he or she has been placed in double jeopardy by reason of a prior conviction or acquittal." (*Brown v. Superior Court of Los Angeles County* (2010) 187 Cal.App.4th 1511, 1525.)

Juvenile dependency proceedings " 'are civil in nature, designed not to prosecute a parent, but to protect the child.' " (*In re Malinda S.* (1990) 51 Cal.3d 368, 384,

superseded by statute on another ground as stated in *People v. Otto* (2001) 26 Cal.4th 200, 207; accord, *In re A.R.* (2009) 170 Cal.App.4th 733, 742; *In re Alyssa F.* (2003) 112 Cal.App.4th 846, 852; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1247.)  "Because civil dependency proceedings under [Welfare and Institutions Code] section 300 are designed not to prosecute the parents but to protect the child, generally the double jeopardy prohibitions of the state and federal Constitutions have no application."  (*In re Lamonica H.* (1990) 220 Cal.App.3d 634, 644, fn. 5; accord, *In re Jesse W.* (2001) 93 Cal.App.4th 349, 357; *In re Roderick U.* (1993) 14 Cal.App.4th 1543, 1551, fn. 4; *In re Carina C.* (1990) 218 Cal.App.3d 617, 624.)  We agree with both of these points. Defendant asserts the determinations concerning double jeopardy were made in a different context and were not central to the courts' holdings.  We are not persuaded that these conclusions are incorrect or should not apply here.  Defendant has offered no persuasive reason why we should depart from this precedent.

Informed by these cases, we further conclude that there is no "acquittal" in dependency proceedings, which are civil in nature, that could serve to preclude subsequent criminal prosecutions on double jeopardy grounds.  Defendant has not supplied any direct authority for his position that dismissal of a dependency petition is tantamount to an acquittal for double jeopardy purposes and serves to bar a subsequent criminal prosecution, and we have found none.  Defendant instead relies on *Evans v. Michigan* (2013) 568 U.S. 313 and its definition of "acquittal" in the double jeopardy context:  "[O]ur cases have defined an acquittal to encompass any ruling that *the prosecution's proof is insufficient to establish criminal liability for an offense.* [Citations].  Thus an 'acquittal' includes 'a ruling by the court that *the evidence is insufficient to convict,*' a 'factual finding [that] necessarily establish[es] *the criminal defendant's lack of criminal culpability,*' and any other 'rulin[g] which relate[s] to *the ultimate question of guilt or innocence.*' "  (*Id*. at pp. 318-319, italics added.)  The

italicized language makes clear the Supreme Court was addressing criminal prosecutions, not civil matters such as dependency proceedings in which a prosecutor is not involved.

Defendant also relies on *In re Dolly A.* (1986) 177 Cal.App.3d 195. In *In re Dolly A.*, the Court of Appeal considered whether the trial court properly denied the defendant's motion for a psychiatric examination of the child based on its conclusion that section 1112, which applies "in any sexual assault prosecution" (§ 1112), also barred such an examination of a victim of sexual assault in a dependency proceeding. (*In re Dolly A., supra*, at p. 201.) The court addressed whether "a dependency proceeding is civil or criminal in nature," and stated the "answer to that question turns upon whether we view a dependency action from the vantage point of the parent or that of the child." (*Id*. at p. 202.) Because the defendant faced both the loss of child custody and criminal charges, the court concluded "the dependency proceeding was, in this instance, more nearly criminal than civil . . . ." (*Id*. at p. 203.) Therefore, the court found that section 1112 applied. (*In re Dolly A., supra*, at p. 203.) *In re Dolly A.* predates the cases on which we rely for the premises that dependency proceedings are civil in nature and that double jeopardy protections do not apply to such matters. No published case has relied on *In re Dolly A.* to conclude that the dismissal of a petition in a dependency proceeding bars a future prosecution on double jeopardy grounds. Nor has any published case relied on *In re Dolly A.* for its consideration of whether dependency proceedings are criminal or civil in nature.

Nor are we persuaded by defendant's argument that, merely because Welfare and Institutions Code section 300, subdivision (d) invokes section 11165.1 to define the term "sexual abuse," juvenile proceedings involving allegations of sexual abuse are equivalent to criminal prosecutions for double jeopardy purposes.

This prosecution is the only time defendant has been prosecuted for the crimes charged in the amended information. Double jeopardy principles did not bar this prosecution.

10

B.    *Section 654 and* Kellett

Defendant asserts that, for the "same reasons" articulated in the section of his brief addressing double jeopardy, prosecution of counts one through twelve was barred by section 654.  Section 654 provides, in part:  "An acquittal or conviction and sentence under any one" provision of law "bars a prosecution for the same act or omission under any other."  (§ 654, subd. (a).)  We have rejected defendant's contention that the prior juvenile dependency proceeding was a "prosecution" that resulted in an "acquittal" for double jeopardy purposes.  We likewise reject defendant's contention that prosecution of these counts was barred by section 654.

Defendant further asserts that his prosecution for additional counts that could have been, but were not, alleged in the dependency proceeding is barred by section 654 and the rule in *Kellett v. Superior Court of Sacramento County* (1966) 63 Cal.2d 822.  (See *id*. at p. 827 [generally, when the "prosecution is or should be aware of more than one offense in which the same act or course of conduct plays a significant part, all such offenses must be prosecuted in a single proceeding . . . .  Failure to unite all such offenses will result in a bar to subsequent prosecution of any offense omitted if the initial proceedings culminate in either acquittal or conviction and sentence"].)  As explained above, there is no prior "acquittal" that would bar this prosecution under section 654 or *Kellett*.  Nor is there a prior prosecution, rendering this a "subsequent prosecution" subject to the rule in *Kellett*.

C.    *Collateral Estoppel*

Defendant next argues that this prosecution was precluded based on the doctrine of collateral estoppel.  Collateral estoppel, or issue preclusion, "bars relitigation of issues earlier decided 'only if several threshold requirements are fulfilled.  First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding.  Second, this issue must have been actually litigated in the former proceeding.  Third, it must have been necessarily decided in the former proceeding.

11

Fourth, the decision in the former proceeding must be final and on the merits.  Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.' ” (*People v. Strong* (2022) 13 Cal.5th 698, 715, 716.) Issue preclusion applies in both criminal and civil proceedings.  (*Ibid*.)

Even assuming the threshold requirements were satisfied here, an issue we do not decide, this does not end our inquiry.  That is because the collateral estoppel “ ‘doctrine will not be applied if such application would not serve its underlying fundamental principles’ of promoting efficiency while ensuring fairness to the parties.”  (*People v. Strong, supra*, 13 Cal.5th at p. 716.)  “[B]ecause collateral estoppel is ultimately subject to considerations of public policy, the doctrine’s application is not automatic.”  (*People v. Ochoa* (2011) 191 Cal.App.4th 664, 669.)  The “public policies underlying collateral estoppel—preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation—strongly influence whether its application in a particular circumstance would be fair to the parties and constitutes sound judicial policy.”  (*Lucido v. Superior Court of Mendocino County* (1990) 51 Cal.3d 335, 343 (*Lucido*).)  We turn to consideration of these public policies as they apply here.

1.  *Integrity of the Judicial System*

Defendant asserts that allowing this prosecution would undermine the integrity of the judicial system by creating the possibility of inconsistent judgments.  As the Supreme Court has stated, “[p]ublic confidence in the integrity of the judicial system is threatened whenever two tribunals render inconsistent verdicts.”  (*Lucido*, *supra*, 51 Cal.3d at p. 347.)  The Supreme Court continued:  “[c]onsistency, however, is not the sole measure of the integrity of judicial decisions.  We must also consider whether eliminating potential inconsistency (by displacing full determination of factual issues in criminal trials) would undermine public confidence in the judicial system.  As has the majority of courts in other jurisdictions, we conclude it would.”  (*Ibid*.)

12

*People v. Percifull* (1992) 9 Cal.App.4th 1457 (*Percifull*) involved facts very similar to those here.  A juvenile court concluded that county counsel had not proven allegations in a dependency petition that the parents had injured their child, or allowed him to be injured, and the parents later moved to dismiss pending felony child abuse and endangerment charges arising out of the same facts.  (*Id*. at pp. 1459-1460.)  The trial court granted the parents' motion.  (*Ibid*.)  Based on its analysis of the policy considerations identified in *Lucido*, however, the Court of Appeal reversed, concluding that collateral estoppel should not have been applied.  (*Ibid*.)

With regard to the integrity of the judicial system, the Court of Appeal emphasized the aims of the two proceedings and that they are, in certain respects, "in direct conflict." (*Percifull, supra*, 9 Cal.App.4th at p. 1462.)  "Under the Welfare and Institutions Code, counsel representing the public must bear in mind legislative admonitions that the Juvenile Court Law is broadly intended not only to protect the public and the child but also 'to preserve and strengthen the minor's family ties whenever possible . . . .' [Citation], and that the dependency provision in particular is intended to extend protection which 'shall focus on the preservation of the family whenever possible.' [Citation.]  A successful prosecution for felony child abuse, on the other hand, may be expected to culminate in prison sentences for one or both parents and thus in the disruption, if not the destruction, of the family.  Thus tactics devised by public counsel in the dependency proceeding, influenced by the need to preserve the family if possible, may not serve the public's interest in imposing legislatively specified punishment for child abuse. . . .  [S]o long as the conflict is legislatively ordained, the sound policies recognized in *Lucido* require that the criminal prosecution be permitted to proceed notwithstanding a finding of no jurisdiction in the dependency proceeding." (*Ibid*.)

The court in *Percifull* further stated that *Lucido*, in which the earlier proceeding was a probation revocation decision, pointed out that "substantial differences in purpose between the earlier proceeding and the criminal action will suffice to justify the second

13

proceeding and a risk of an inconsistent result:  'Preemption of trial of a new charge by a revocation decision designed to perform a wholly independent social and legal task would undermine the function of the criminal trial process as the intended forum for ultimate determinations as to guilt or innocence of newly alleged crimes.  [Citations.]' "  (*Percifull, supra*, 9 Cal.App.4th at p. 1462, quoting *Lucido, supra*, 51 Cal.3d at p. 349.)

Our Supreme Court has noted that, while it has "at times applied collateral estoppel principles to preclude criminal trials," it has done so "only when compelling public policy considerations outweighed the need for determinations of guilt and innocence to be made in the usual criminal trial setting." (*Lucido, supra*, 51 Cal.3d at p. 349.)  We conclude "there is no consideration so compelling as to outweigh the public's right to have [defendant's] criminal culpability separately and fully assessed in the criminal trial process, even if the result of that assessment may ultimately be, or be perceived to be, inconsistent with the conclusion the juvenile court reached." (*Percifull, supra*, 9 Cal.App.4th at p. 1462.)

2.      *Judicial Economy*

Defendant asserts that giving a preclusive effect to the dependency proceeding would promote judicial economy by minimizing repetitive litigation.  "In *Lucido* the Supreme Court concluded that considerations of judicial economy were outweighed by the factors it had discussed in connection with judicial integrity:  'Whatever the efficiencies of applying collateral estoppel in this case, they pale before the importance of preserving the criminal trial process as the exclusive forum for determining guilt or innocence as to new crimes.' " (*Percifull, supra*, 9 Cal.App.4th at p. 1463, quoting *Lucido, supra*, 51 Cal.3d at p. 351.)  This holds true here as well.

3.      *Vexatious Litigation*

The "essence of vexatiousness . . . is not mere repetition.  Rather, it is harassment through baseless or unjustified litigation." (*Lucido, supra*, 51 Cal.3d at p. 351.)

Defendant asserts the application of collateral estoppel here would protect individuals like him "from being harassed by successive litigation by the government."

But, as in *Percifull*: "prosecution of the child abuse charges in this case could not rationally be regarded as either baseless or unjustified." (*Percifull, supra*, 9 Cal.App.4th at p. 1463.) Indeed, unlike *Percifull*, in which the criminal matter had not proceeded to verdict, here a jury found defendant guilty on all counts. To be sure, there was ample evidence on which a prosecutor could elect to file charges. As the court stated in *Percifull*: "We do not hold that the charges in this case, or in cases like this one, must invariably be brought to trial. We hold only that in these circumstances these charges should not have been wholly removed from the criminal trial process by the conclusion, as a matter of law, that prosecution was barred by collateral estoppel. One critically important element of the criminal trial process is the exercise of the district attorney's sound discretion as to whether prosecution is or is not warranted in any particular case." (*Ibid*.)

4.    Lockwood

To support his position, defendant relies principally on *Lockwood v. Superior Court of Santa Clara County* (1984) 160 Cal.App.3d 667. In *Lockwood*, the parents moved to dismiss criminal proceedings charging them with felony child abuse on collateral estoppel grounds based on the dismissal of a prior juvenile dependency petition. (*Id*. at p. 669.) The trial court denied their motion, but the Court of Appeal reversed, ordering criminal proceedings dismissed. (*Id*. at pp. 669, 673.) However, completely absent in *Lockwood*, which predated *Lucido* and *Percifull*, was any express weighing of the public policies underlying the doctrine of collateral estoppel. Concerning those policies, the court only stated, " '[t]he inquiry that must be made is whether the traditional requirements and policy reasons for applying the collateral estoppel doctrine have been satisfied' " (*id*. at p. 672), and that the People's argument would "erode the policy purposes of the collateral estoppel doctrine" (*id*. at p. 673). Even

15

if we deemed these passing references to policy to indicate that the court fully weighed all of the relevant policy considerations, we find *Percifull* more persuasive.

As noted, the application of collateral estoppel "is not automatic" (*People v. Ochoa*, *supra*, 191 Cal.App.4th at p. 669), and the underlying public policies strongly inform whether it should be applied (*Lucido, supra*, 51 Cal.3d at p. 343). We conclude that those policies do not support the application of collateral estoppel principles in this case.

## II

### *Delay in Prosecution*

#### A. *Additional Background*

In the trial court, defendant moved to dismiss the counts involving R. on due process grounds based on the delay in bringing criminal charges against him. Defendant emphasized that R. first reported her accusations to law enforcement in 2013, yet criminal charges were not filed until 2017. He asserted that specified evidence was no longer available as a result. The trial court denied defendant's motion, concluding, among other things, that defendant failed to show actual prejudice as a result of the delay.

#### B. *Defendant's Contentions*

Defendant argues that the delay between the 2013 reporting and 2017 filing of criminal charges was unjustified, violated his due process rights, and undermined his ability to present a defense. We disagree.

#### C. *Applicable Law and Standard of Review*

"The due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution protect a defendant from the prejudicial effects of lengthy, unjustified delay between the commission of a crime and the defendant's arrest and charging." (*People v. Cowan* (2010) 50 Cal.4th 401, 430 (*Cowan*).) "The statute of limitations is usually considered the primary guarantee against overly stale criminal charges [citation], but the right of due

16

process provides additional protection, safeguarding a criminal defendant's interest in fair adjudication by preventing unjustified delays that weaken the defense through the dimming of memories, the death or disappearance of witnesses, and the loss or destruction of material physical evidence [citation]." (*People v. Jones* (2013) 57 Cal.4th 899, 921.) " ' "A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay. The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay." ' " (*People v. Bracamontes* (2022) 12 Cal.5th 977, 987.) "Prejudice may be shown by ' "loss of material witnesses due to lapse of time [citation] or loss of evidence because of fading memory attributable to the delay." ' " (*Cowan, supra*, at p. 430.) "Prejudice to a defendant from precharging delay is not presumed." (*People v. Abel* (2012) 53 Cal.4th 891, 908-909.) "If defendant fails to show prejudice, the court need not inquire into the justification for the delay since there is nothing to 'weigh' such justification against." (*People v. Dunn-Gonzalez* (1996) 47 Cal.App.4th 899, 911; accord, *Abel, supra*, at p. 909.)

We review the denial of a motion to dismiss for prejudicial prearrest or precharging delay for abuse of discretion. (*Cowan, supra*, 50 Cal.4th at p. 431.) "Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004.) We defer to the trial court's factual findings if they are supported by substantial evidence. (*Cowan, supra*, at p. 431.)

D.     *Prejudice Arising from the Delay*

To support his assertion of prejudice, defendant focuses first on evidence he claims was lost as a result of the precharging delay. He cites the purported loss of surveillance videos showing the bus where some of the alleged incidents involving R. took place. In his motion, defendant referred to "surveillance videos pointed at the bus . . . ." In his

17

supporting declaration, defendant stated he installed the surveillance system in 2008. At the hearing on defendant's motion, defendant's counsel represented that, in 2008, defendant installed a video surveillance system "faced toward this bus." According to defense counsel, "if the charges had been brought in 2013, [defendant] would have been able to get video surveillance that would purportedly not show him going to the bus to assault [R.]. Now those videos are now gone."

The conduct on the bus allegedly occurred between December 1, 2007, and November 30, 2008 (count one), and between December 1, 2008, and November 30, 2009 (count two). Thus, it is not even clear that the surveillance system was installed before these incidents. Additionally, there is no evidence in defendant's declaration of whether surveillance footage was recorded and stored, and, if they were, for how long they were preserved. Moreover, defendant did not state that the videos were available in 2013 and only became unavailable at some point between 2013 and 2017. Thus, defendant has not linked the absence of surveillance videos, if any, to prejudicial precharging delay.

Defendant next mentions "a computer containing messages between [R.] and [A.]." In his declaration, defendant stated his attorney had been in possession of a laptop "that had communications between [R.] and [A.] where the subject matter was these allegations." At the hearing, defense counsel stated there "was a computer that [defendant] had that–that when it had some power, [defendant] noticed conversations between [R.] and [A.]. Before [defendant] could read those, the computer shut off, and he was unable to repower them." Defendant represented at the hearing that he gave his then-attorney the computer the day he turned himself in, June 6, 2017. Some unspecified time thereafter, that attorney allegedly lost the computer, or it was stolen, during an office move. Defendant has not demonstrated this evidence was material; he never read the communications. Moreover, he has failed to demonstrate that the evidence went missing

18

as a result of the delay between 2013 and 2017. The record shows the computer went missing some time after June 6, 2017. Defendant was arraigned less than one week later.

Defendant next discusses the clothes he was wearing the night R. first disclosed her allegations. The night Shannon pointed the gun at him, defendant stated that he gave the clothes he was wearing to Shannon to give to law enforcement. However, "[t]hose clothes are gone." According to defense counsel, the clothes were stored in a closet and either destroyed or washed between 2013 and 2017. The prosecutor stated the clothing had been washed long before R. went to law enforcement. We presume the relevance of this evidence would be the presence or absence of biological material on the clothing. However, according to R.'s account, defendant did not engage in sexual activity with her that night; as he prepared to orally copulate her, they were interrupted by Shannon. In any event, there is no basis for us to conclude the clothes were lost as a result of the delay. Lastly, as the trial court noted, despite the loss of the clothes, defendant would not be precluded from arguing the absence of biological evidence supporting his guilt.

Next, defendant raises R.'s original accusation and recantation letters. In his declaration, he stated that R. "wrote two letters recanting the allegations she made against me. Those letters have disappeared," and that R. "wrote, in a notebook, allegations against [him]. That notebook has disappeared. (There were less incidents in the notebook than what is being alleged now.)" At the hearing, the prosecutor represented that the original letters were never in the possession of law enforcement. She stated that defendant provided law enforcement with a copy of the recantation letter, but kept the original. The prosecutor also represented that "these items have gone missing again after the defendant was arrested in 2017." Even putting aside the representations that copies of these documents remain, defendant has made no showing as to when they "disappeared," let alone connected their disappearance to precharging delay.

Defendant next raises "records showing [his] travels to Texas." Defendant stated that he was in Texas during some of the times when R. claimed he sexually abused her.

19

He had receipts allegedly proving that he was in Texas, but those "receipts are gone." Relatedly, he stated his parents would have been able to testify to his absence from California, but his father has died, and his mother has dementia. At the hearing, defense counsel represented defendant was traveling between California and Texas in 2008 and 2009 because he was selling property in Texas. According to defense counsel, defendant had the receipts in 2013, and his attorney had them at the time of the dependency proceeding, but "those receipts are now gone." Setting aside the fact that, if defendant was selling property in Texas, he likely would have other proof of his presence there, defendant has not demonstrated that loss of this evidence was connected to precharging delay—defendant did not identify when the receipts went missing, when his father died, or when his mother developed dementia.

Defendant also argues that he attempted to turn over to law enforcement for forensic testing a couch that had been on the bus, but law enforcement declined to take it, "and this couch is also now gone." In his declaration, defendant did not mention a couch. At the hearing, the prosecutor stated there was nothing in discovery indicating defendant ever proffered the couch, "and so the People would refute that offer was made." The prosecutor also noted there was other evidence that had been swabbed for DNA yielding negative results. Thus, defendant could demonstrate to the jury that some evidence, if not the couch, had tested negative for biological matter. Moreover, if true, defendant could offer proof at trial that he had tendered the couch to law enforcement only to have his offer refused. And, yet again, defendant does not establish when the couch went missing and has made no connection between the loss of the couch and the precharging delay.

Next, defendant identifies "Minister David," as a witness who was "walking in front of the house on the day of one of the charged incidents." This individual was not mentioned in defendant's declaration. Defense counsel stated at the hearing that Minister David "had testified that the incident did not happen. In fact, [he] contacted [defendant] . . . and told him that he remembered that day and that nothing had happened." The

20

prosecutor responded that defendant had indicated that the minister died in 2018, *after* charges were filed. If this were true, defendant could not connect the loss of evidence to precharging delay. Moreover, as the trial court noted, "even presuming Minister David could testify to something, it's unclear exactly what he would testify and it seems highly unlikely that his testimony would have gone to the heart of the allegation unless [R. was] forced to have sex within eyesight or Minister David was inside with them at the time of the event."

Defendant also emphasizes that he sustained head injuries affecting his ability to recall dates and times. He did not mention these injuries or their effects in his declaration. His attorney represented that defendant sustained a head injury during the dependency proceedings, and "[p]rior to that," he had hit his head in a car accident. Given that defendant had already sustained these head injuries at the time of the dependency proceedings in 2013, he cannot establish he was prejudiced as a result of the precharging delay thereafter.

Defendant also argues that he was prejudiced by his inclusion on the Child Abuse Central Index list. According to his counsel at the hearing, defendant was placed on the list in 2013. Defendant asserts that this was stigmatizing and left his children and others with the impression that R.'s allegations were true, and the delay afforded time for D. and A. to be pressured into participating in the case against him. We have found no record proof that defendant's name was on the list. In any event, given the purported addition of his name to the list in 2013, that cannot be ascribed to precharging delay between 2013 and 2017. As for the ongoing listing of his name, defendant offered nothing to establish his children knew his name appeared on the list or had even heard of it. And to the extent he cites the passage of time as affording the opportunity for his children to be improperly influenced, his contention is speculative and, again, unsupported by any record evidence.

Defendant asserts the length of the delay itself was prejudicial. But again, prejudice is not presumed. (*People v. Abel, supra*, 53 Cal.4th at pp. 908-909.) "The

21

actual amount of time between the commission of the crime and the filing of charges is not the critical issue in determining prejudice." (*People v. Hartman* (1985) 170 Cal.App.3d 572, 579.) "A defendant must show *actual* prejudice based on the facts of the case." (*Ibid.*)

As to each of defendant's claims, we have concluded that he has not established actual prejudice arising from the delay in filing criminal charges. We conclude substantial evidence supported the trial court's factual findings, and that, in the absence of actual prejudice, the trial court did not abuse its discretion in denying defendant's motion to dismiss. (See *Cowan, supra*, 50 Cal.4th at p. 431.)

III

*Exclusion of R.'s Statement that She Was a "Virgin"*

A.      *Additional Background*

The defense filed a motion pursuant to Evidence Code section 782 to introduce evidence of R.'s sexual conduct. The motion did not refer to any statement made by R. to her then-boyfriend that she was a "virgin."

In argument before the trial court, however, the defense sought to introduce evidence that R. told her then-boyfriend that she was a "virgin." R. allegedly made this statement after defendant was alleged to have had sex with her, suggesting that, if the statement were true, her accusations against defendant were false.

The trial court excluded this evidence. The court first found this remark referred to R.'s sexual activity and therefore was covered under Evidence Code section 782. The court also determined the statement had very little probative value because it was vague and subject to multiple interpretations, and because it was unknown whether it was a truthful statement. The court stated there were many ways to challenge R.'s credibility, but this statement "opens up her entire sex life." The court excluded the statement pursuant to Evidence Code sections 352 and 782.

22

B.    *Defendant's Contentions*

Defendant asserts the trial court erred and violated his constitutional rights to due process, to confrontation, and to present a defense by excluding this evidence. He contends that the statement would be inconsistent with R.'s allegations against him, and would thus be relevant proof that her allegations were false. We conclude the trial court did not abuse its discretion in excluding the statement.

C.    *Applicable Law and Standard of Review*

Only relevant evidence is admissible at trial. (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

"A defendant generally cannot question a sexual assault victim about his or her prior sexual activity." (*People v. Bautista* (2008) 163 Cal.App.4th 762, 781; see Evid. Code, § 1103, subd. (c)(1).) "However, a limited exception is applicable if the victim's prior sexual history is relevant to the victim's credibility." (*Bautista, supra*, at p. 781, citing Evid. Code, § 1103, subd. (c)(4).) "Evidence Code section 782 is designed to protect victims of molestation from 'embarrassing personal disclosures' unless the defense is able to show in advance that the victim's sexual conduct is relevant to the victim's credibility." (*Bautista, supra*, at p. 782.)

In seeking to introduce such evidence, "the defendant must file a written motion and an offer of proof detailing the relevancy of the evidence. [Citation.] If the court finds the offer sufficient, it shall order a hearing out of the presence of the jury to allow questioning of the complaining witness regarding the offer of proof.[6] [Citation.] If the court finds the evidence relevant under [Evidence Code] section 780 and admissible

---

[6]    Defendant does not raise the trial court's failure to conduct an evidentiary hearing as an additional claim of error.

under [Evidence Code] section 352, the court may make an order stating what evidence may be introduced by the defendant and what questions are permitted." (*People v. Fontana* (2010) 49 Cal.4th 351, 354.)

We employ the abuse of discretion standard in reviewing a trial court's ruling on the admissibility of evidence generally (*People v. Waidla* (2000) 22 Cal.4th 690, 717), and specifically in reviewing a court's ruling on the admissibility of evidence of prior sexual conduct (*People v. Bautista, supra*, 163 Cal.App.4th at p. 782).

D.    Analysis

As noted, defendant did not include the statement at issue in his written motion and offer of proof. (See Evid. Code, § 782, subd. (a)(1), (2); *People v. Fontana, supra*, 49 Cal.4th at p. 354.) However, defendant did raise the statement at argument before the trial court. The court considered defendant's argument and denied the motion insofar as it sought admission of this statement. Because the trial court considered and ruled on defendant's request, and in light of defendant's contention that, if his claim was forfeited, he was deprived of the effective assistance of counsel, we address the merits of defendant's argument.

R.'s statement to her then-boyfriend that she was a "virgin," allegedly made after defendant had sex with her, was potentially relevant to her credibility and had some "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) As defendant argued, if R.'s statement was true, it could mean, depending on the meaning of the term, that her accusations that defendant had sex with her were false. It could also suggest R. was not credible because it could mean either certain of her accusations against defendant were false or her statement to her then-boyfriend was false. Because the statement was potentially relevant to R.'s credibility, it could come within the limited exception to the exclusion of evidence concerning a victim's prior sexual activity. (Evid. Code, § 782.)

24

Nonetheless, we conclude the trial court did not abuse its discretion in excluding this evidence pursuant to Evidence Code section 352.  That section provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

This evidence was of limited probative value.  First, as the prosecution argued and the trial court agreed, and contrary to defendant's position, the term "virgin" does not have a single meaning.  "When attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition of that word."  (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121-1122.)  One dictionary defines the noun "virgin" as, among several definitions, "an absolutely chaste young woman," "an unmarried girl or woman," and "a person who has not had sexual intercourse."  (Merriam-Webster's Collegiate Dictionary (11th ed. 2006) p. 1397, col. 1.)  Assuming the applicability of the latter definition, the same dictionary includes differing definitions of "sexual intercourse" we need not explore here.  (Merriam-Webster's Collegiate Dictionary (11th ed. 2006) p. 1141, col. 1.)  Additionally, as the prosecutor argued, it is conceivable that an individual would say they lost their virginity with the first person they *chose* to have sex with rather than with someone who *forced* sex upon them.  Moreover, there are numerous reasons R. might choose to tell her then-boyfriend she was a "virgin" whether the statement was true or not.  Among other things, she may not have been ready to disclose that her stepfather was raping her and forcing her to engage in other unwanted sexual activity.  The probative value of this statement was therefore quite limited.

This limited probative value was substantially outweighed by the probability that admission of this evidence would necessitate undue consumption of time and would create substantial danger of undue prejudice, of confusing the issues, or of misleading the

25

jury. (Evid. Code, § 352.) Admitting the statement could have led to an inquiry into whether the statement was true and whether R., a sexual abuse victim, was or was not a "virgin." The parties would have explored if R.'s then-boyfriend was telling the truth that R. made the statement, whether R. was telling the truth in making the statement, and whether R. and her then-boyfriend understood the term in the same way. This would necessitate something of a mini-trial on a minor statement to impeach R.'s credibility on a matter ordinarily excluded at trial.

Moreover, there were alternative avenues to explore in seeking to impeach R.'s testimony and challenge her credibility without delving into her sexual conduct. These included the recantation letter and her mother's testimony that R. told her she lied in making her accusations against defendant.

We conclude the trial court did not abuse its discretion in excluding this statement pursuant to Evidence Code section 352. As such, we need not address defendant's contention that this evidence was not subject to Evidence Code section 782. Additionally, " 'reliance on Evidence Code section 352 to exclude evidence of marginal impeachment value that would entail the undue consumption of time generally does not contravene a defendant's constitutional rights to confrontation and cross-examination.' " (*People v. Pearson* (2013) 56 Cal.4th 393, 455.) " ' "[U]nless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witness's] credibility' [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment." ' " (*Id*. at pp. 455-456.) Defendant has made no such showing here.

## IV

### *Exclusion of Expert Testimony*

#### A. *Additional Background and the Parties' Contentions*

During her testimony about the recantation letter, when asked if she ripped defendant's draft of the letter out of the notebook and began copying it on the next page,

R. responded, "I don't remember if I copied it directly on the next page or if I flipped through the book. But I know I ripped the pages out so I could see them and then I copied the notebook."

The defense sought to present the testimony of two experts in the field of document examination who would have testified there were no physical impressions or indentations on R.'s recantation letter consistent with defendant having written his draft on pages on top of those on which R. wrote her version. This could suggest there was no draft written by defendant from which R. copied her letter. The prosecutor objected, among other things, on foundation grounds, noting R. did not know whether she wrote her letter on the next page or elsewhere in the notebook. The trial court excluded the evidence.

Defendant asserts the trial court erred and violated his constitutional rights by excluding this expert testimony. The People respond that the trial court properly excluded the testimony, in part, because it lacked foundation and relevance. We agree with the People.

B. *Applicable Law and Standard of Review*

A witness testifying as an expert may offer opinion testimony related to a subject "that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) " 'However, even when the witness qualifies as an expert, he or she does not possess a carte blanche to express any opinion within the area of expertise. [Citation.] For example, an expert's opinion based on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors [citation], has no evidentiary value [citation] and may be excluded from evidence. [Citations.]' " (*Sanchez v. Kern Emergency Medical Transportation Corp.* (2017) 8 Cal.App.5th 146, 155.) The "trial court has broad discretion to determine whether proposed expert testimony lacks the necessary foundation to be reliable, relevant and admissible." (*People v. Fortin* (2017) 12 Cal.App.5th 524, 531.) We review the

decision to exclude expert testimony for abuse of discretion.  (*People v. Peterson* (2020) 10 Cal.5th 409, 457.)

    C.    *Analysis*

For the opinions concerning the lack of impressions on R.'s recantation letter to be relevant and have the proper foundation, R. would have had to draft her letter on pages underneath, or in close proximity to, the page on which defendant wrote his draft.  There is no evidence to support this premise.

In her trial testimony, R. testified she took the page out of the notebook that contained defendant's draft and began to write her version.  Asked if she ripped defendant's draft out of the notebook and began copying on the next page, R. responded, "I don't remember if I copied it directly on the next page or if I flipped through the book.  But I know I ripped the pages out so I could see them and then I copied the notebook."  R.'s trial testimony sheds no light on the location of the pages on which she wrote relative to those on which defendant prepared his draft.

In the transcript of an interview between R. and Detective Kevin Darling, R. described her process in copying the letter.  Similar to her trial testimony, she stated that she tore the pages containing defendant's draft out of the notebook and wrote her version in the notebook so she "could just look back and forth."

Absent evidence that the pages of the notebook R. wrote on had been in relatively close proximity beneath those on which defendant wrote, there is no foundation for the experts' opinions that there were no impressions on R.'s letter.  Relatedly, in the absence of such evidence, testimony about the absence of such impressions would have no relevance, would not assist the jurors, and would not contradict R.'s testimony or prior statements so as to be relevant to impeach her.

Defendant acknowledges that R. "was ambiguous about which pages" of the notebook she used to write her letter.  However, he asserts "it wouldn't have made sense for her to start writing somewhere in the middle of the notebook," and it "would've

instead been more logical for her to simply use the next pages." This is pure speculation. An "expert's opinion that something *could* be true if certain assumed facts are true, without any foundation for concluding those assumed facts exist . . . , does not provide assistance to the jury because the jury is charged with determining what occurred in the case before it, not hypothetical possibilities." (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117.)

The trial court did not abuse its discretion in excluding the expert testimony.

D.     *Ineffective Assistance of Counsel*

Defendant argues that the trial court erred by failing to consider the testimony by R. and one of the document examination experts in the dependency proceeding describing how he thought R.'s letter might have been written. At trial, defendant sought to admit that testimony, but the trial court informed him his attorney would have to do so, which it appears defense counsel did not do.

To prevail on a claim of ineffective assistance of counsel, a defendant must show: (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.)

In considering an ineffective assistance of counsel claim in defendant's post-verdict motion for a new trial, the trial court concluded that a review of R.'s testimony in the dependency proceeding did "not reveal any material inconsistencies such that [defense counsel] should have used the transcript [from] the dependency hearing to impeach [R.] at trial." The court stated: "The best support Defendant has for his necessary foundational fact is that [R.] testified [in the dependency proceeding] that she 'probably' would have written the letter th[e]n flipped to the next page. This was a speculative answer to a hypothetical question."

29

The trial court was correct. More importantly, having reviewed the sealed testimony from the dependency proceedings, it is sufficient to say that R.'s testimony, paraphrased by the trial court above, cannot reasonably be characterized as discussing anything about the proximity of defendant's draft to her own.

Defendant contends that one interpretation of R.'s various accounts "was that she had written on the pages of the notebook immediately after the pages that had supposedly been written on by" defendant. We do not agree. In her trial testimony, R. said she did not remember whether she wrote "directly on the next page or if I flipped through the book." In her interview with Detective Darling, she only stated that she tore defendant's draft out of the notebook "and then I used that notebook to write it so I could just look back and forth." In the juvenile dependency proceeding, her testimony in no way discussed the proximity of defendant's draft in the notebook to her own. Defense counsel was not ineffective for failing to proffer evidence that was not relevant. (See *People v. Carter* (2003) 30 Cal.4th 1166, 1225 [counsel was not ineffective for failing to introduce evidence that was irrelevant as a matter of law].)

As for the testimony of the experts, defendant asserts their testimony would have shown that, for R.'s account to be true, she would have had to write on pages that "were many pages down from pages written on by" defendant, and on pages that "weren't sequential." However, as for the former observation, there is no evidence in the record to establish, or even suggest, where in the notebook R. wrote her version relative to defendant's draft. As for the latter, defense counsel could have concluded that this evidence had such insignificant probative value that it would be pointless to proffer it. Defense counsel was not ineffective for failing to do so.

V

*COVID-19 Pandemic Continuation and Motion for a Mistrial*

A.     *Additional Background*

The prosecution opened its case on March 9, 2020, and rested on March 12, 2020. Before the defense commenced its case, the trial court granted several continuances, and then, as a result of the emerging COVID-19 pandemic, suspended the trial. The trial did not resume until June 10, 2020. Defendant moved for a mistrial based on the delay as well as certain logistics of resuming trial during the pandemic including masking and spaced-seating requirements. The trial court denied the motion. When the trial resumed, two jurors were absent for health-related reasons, and the court substituted in two of the four alternates. The defense presented its case over three days, June 10, 15, and 16, 2020.

B.     *The Parties' Contentions*

Defendant argues that the trial court prejudicially erred by denying his motion for a pandemic-related mistrial, emphasizing the length of the delay, which could impact jurors' ability to recall evidence; masking requirements preventing the defense from observing jurors' reactions; jurors' differing vantage points as they sat spaced throughout the courtroom; that jurors seated behind the defense table could see defense counsel's notes; juror preoccupation with health concerns; the extent to which the trial was open to the public; the loss of two jurors; and the fact that all of these circumstances affected only the defense, as the prosecution presented its case before the shutdown. According to defendant, these circumstances rendered his trial imbalanced and unfair in violation of his due process rights.

The People assert there was good cause for the interruption of the proceedings, and defendant failed to demonstrate he suffered actual prejudice.

We conclude the suspension of the trial, its timing, and the health precautions implemented in the courtroom did not result in prejudice and did not deprive defendant of

a fair trial. The trial court did not abuse its discretion in denying defendant's motion for a mistrial.

C.    *Applicable Law and Standard of Review*

"A criminal defendant has a fundamental constitutional right to a fair trial by an impartial jury. [Citations.] 'It is well settled that legal necessity for a mistrial "arises from an inability of the jury to agree, or from physical causes beyond the control of the court, such as the death, illness, or absence of judge or juror, or of the defendant." [Citation.]' [Citations.] ' "A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]" [Citation.] A motion for a mistrial should be granted when " ' "a [defendant's] chances of receiving a fair trial have been irreparably damaged." ' " ' " (*People v. Breceda* (2022) 76 Cal.App.5th 71, 89 (*Breceda*).)

An appellate court generally employs the "deferential abuse of discretion standard to review a trial court ruling denying a mistrial." (*People v. Bolden* (2002) 29 Cal.4th 515, 555.) "In cases where a defendant's federal constitutional rights to due process and a fair trial are implicated, courts apply the de novo standard of review." (*People v. Garcia* (2022) 83 Cal.App.5th 240, 248 (*Garcia*), review granted Jan. 11, 2023, S276858, review dismissed and cause remanded June 12, 2024.)

D.    *Analysis*

"Health quarantines to prevent the spread of infectious diseases have long been recognized as good cause for continuing a trial date." (*Breceda, supra*, 76 Cal.App.5th at p. 91.) Defendant does not contend the pandemic did not constitute good cause for suspending trials and for imposing masking and distancing requirements, public-access limitations, and other restrictions as a general matter. Instead, he contends that "the delay

and restrictions resulting from the onset of the pandemic created an imbalance and unfairness that affected [his] trial in particular."

As defendant acknowledges, recent cases have upheld trial courts' denials of motions for mistrials based on suspensions of trials and resulting restrictions caused by the COVID-19 pandemic. In *Breceda, supra*, 76 Cal.App.5th 71, the trial was continued for 72 days, after which the trial court denied the defendant's mistrial motion. (*Id*. at p. 75.) The Court of Appeal disagreed with the defendant's argument that the pause in his trial violated due process, concluding that, although the pause was long, it was unavoidable, and the defendant's "constitutional rights were not set aside and forgotten." (*Ibid*., citing *Roman Catholic Diocese of Brooklyn, New York v. Cuomo* (2020) 594 U.S. 14, 19.) The court rejected the defendant's contention that the 73-day delay, near the end of the prosecution's case-in-chief, "caused the jurors to decide the case in the prosecution's favor and to discuss the case with others." (*Breceda, supra*, at p. 95.) The appellate court stated defendant's contention would be tantamount to a presumption that the jurors violated the trial court's admonishments, and stated those concerns were "belied by the record." (*Ibid*.) In discussing whether the defendant was prejudiced, the court stated: "The delay was long, but that was the only factor weighing in favor of a violation. The COVID-19 pandemic was good cause to continue the trial. The trial court properly admonished the jurors before the pause, and when they returned, ensured they obeyed the court's orders. . . . [T]he case was not complex . . . . Finally, the fact the delay occurred before jury deliberations began weighs against presuming there was prejudice. Based on these factors, we . . . cannot find the delay was inherently prejudicial. Therefore, [the defendant's] due process right to a fair trial was not violated as a matter of law." (*Id*. at p. 100.)

In *Garcia, supra*, 83 Cal.App.5th 240, the 103-day delay caused by the COVID-19 pandemic occurred after both sides had presented their cases. (*Id*. at pp. 243, 252.) In fact, the appellate court noted, "the timing of the delay at least occurred at a natural break

33

during the trial." (*Id*. at p. 252.)  The court stated that the case was not particularly complex, noting witness testimony only lasted for eight days and that the jury only had to determine whom they believed.  (*Id*. at p. 253.)  The court also stated, "[T]here was no evidence that any jurors would have trouble remembering the evidence presented before the recess, and it would have been pure speculation for the trial court to assume so." (*Ibid*.)  Based on "the timing of the continuance, the relative lack of complexity of the case, and the trial court's communications with and instructions to the jury," the Court of Appeal found no error or due process violation in the denial of the defendants' motion for a mistrial.  (*Id*. at pp. 243, 254.)

In *People v. Kocontes* (2022) 86 Cal.App.5th 787 (*Kocontes*), the defendant argued, "the trial court erred by denying his motions for a mistrial and continuance because the courtroom configuration after the COVID-19 pause interfered with jurors' ability to assess witness demeanor, his ability to communicate with [defense counsel], and his right to a public trial in violation of the federal constitution."  (*Id*. at p. 866.)  The Court of Appeal disagreed.  (*Ibid*.)  The court further disagreed with the defendant's contentions that "the trial court erred by denying his mistrial and continuance motions because of the delay and the uneven playing field."  (*Id*. at p. 878.)  As to the "uneven playing field," the court noted, "[d]ue process does not require absolute symmetry between rights granted to the prosecution and those afforded the defense.  Our system is not one of symmetry at every stage, but of an overall balance designed to achieve the goal of a fair trial."  (*Id*. at pp. 878-879.)  Ultimately, the court concluded:  "The COVID-19 pandemic meant [the defendant's] presentation of his case was to some extent asymmetrical to the prosecution's case, vis-à-vis, the courtroom configuration.  But the trial court's thoughtful and well-designed reconfiguration resulted in an overall balanced grant of rights and advantages to the prosecution and [the defendant].  Thus, the trial court did not err by denying [the defendant's] mistrial motion . . . .  His federal constitutional rights were not violated."  (*Id*. at p. 880.)

*Kocontes* addressed a number of the issues raised by defendant here concerning the post-COVID-19 pandemic configuration of courtrooms, communication with counsel, masking requirements, and the ability to assess demeanor and public trial concerns. (*Kocontes, supra*, 86 Cal.App.5th at pp. 871-878, 880.)  Here, as in *Kocontes*, these circumstances establish neither a prejudicial deprivation of defendant's right to a fair trial, nor that the trial court abused its discretion in denying his motion for a mistrial.

Defendant does not urge us to depart from the holdings in *Breceda*, *Garcia*, and *Kocontes*, or contend that they were wrongly decided.  Rather, he distinguishes these cases based on the unique timing of the delay here, asserting the delay impacted only the defense, creating unfairness and imbalance at trial.  The precise timing of the pause here—between the prosecution's case-in-chief and defendant's case—was different from the circumstances in these other cases.  In *Breceda*, the prosecution had "nearly completed its case-in-chief" when the trial was paused.  (*Breceda, supra*, 76 Cal.App.5th at p. 74.)  In *Garcia*, the pause occurred after both sides had presented their cases. (*Garcia, supra*, 83 Cal.App.5th at p. 252.)  And in *Kocontes*, the pause occurred after the defense had commenced its case but before it was completed.  (*Kocontes, supra*, 86 Cal.App.5th at pp. 866-867.)  While "the unique facts of each case must govern the court's analysis" (*Garcia, supra*, at p. 256), we do not find this distinction justifies a departure from the analyses and conclusions in these cases.  In fact, "the timing of the delay at least occurred at a natural break during the trial" (*id*. at p. 252), and "the fact the delay occurred before jury deliberations began weighs against presuming there was prejudice."  (*Breceda, supra*, at p. 100.)

Defendant asserts the timing of the break "created a serious risk that, during the intervening months, the jurors would've started forming opinions—even if only subconsciously or unintentionally—about [defendant's] guilt based only on the prosecution's evidence, before they had heard any of the defense case."  Defendant's contentions are pure speculation.  The defendant in *Breceda* made a similar argument,

asserting the delay "during the prosecution's case-in-chief resulted in jurors deciding the case in the prosecution's favor and jurors discussing the case with others." (*Breceda, supra*, 76 Cal.App.5th at pp. 93, 95.) The Court of Appeal concluded there "was no evidence jurors had already decided the case when they returned to court . . . . It can just as easily be speculated that because the prosecution's case was more remote in time, the strength of the prosecution's evidence faded in the jurors' minds." (*Id*. at p. 95.) The court concluded: " 'We do not agree that, in the absence of any proof and in the face of the trial court's admonitions to the jury, it is "reasonable to infer" the jury's impartiality was compromised.' " (*Ibid*.) Addressing prejudice, the court stated: "Before the pause in proceedings, the trial court admonished the jury to not form any opinions about the evidence, discuss the case or the evidence, conduct any independent research, or read or listen to any news reports about the case. . . . It is pure speculation to conclude that during the recess jurors decided the case in the prosecution's favor or were influenced by outside sources. We presume jurors follow the trial court's instructions." (*Id*. at p. 99.)

Here, on the last day of trial before the pause, the trial court reminded the jurors, as it had previously: "You have not heard all the evidence in the case so do not make up your mind or form or express any opinions about the case until all the evidence has been presented to you and you've deliberated on it." Moreover, while the trial was suspended, the court clerk "had contact with all of our jurors on multiple occasions reminding them of the admonitions . . . ." "The jury is presumed to have followed the trial court's instructions in the absence of any indication it was unwilling or unable to do so." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 196.)

Defendant contends his case "is exactly like the situation found to be prejudicial in" *People v. Engleman* (1981) 116 Cal.App.3d Supp. 14 (*Engleman*), "where the delay occurred after the prosecution had rested and before defendant['s] case had begun." In *Engleman* the three-week pause "was ordered by the trial judge so that he could return to his 'home court' . . . ." (*Id*. at p. Supp. 20.) Concluding that the defendant was

36

prejudiced by the delay, the court stated: "The delay came after the jury had heard the People's case and before the defendant had a chance to introduce his evidence. Thus the jury was left with a one-sided presentation for three weeks. We feel this would cause the jurors to determine the case before hearing both sides. Given the length of the delay, we think it must have been practically impossible for the jurors to keep an open mind as to possible answers to the People's case. We hold that this was inherently prejudicial to defendant's receiving a fair trial, even though it is hard to demonstrate what effect this delay had on the jurors' thought processes." (*Id*. at p. Supp. 21.)

The defendants in *Breceda* and *Garcia* also relied on *Engleman*. (*Garcia, supra*, 83 Cal.App.5th at pp. 249-250; *Breceda, supra*, 76 Cal.App.5th at pp. 93, 95.) The court in *Breceda* stated that "reliance on *Engleman* is . . . misplaced because here . . . there was good cause for the pause in proceedings and there were no simple solutions such as transferring the case to another judge." (*Breceda, supra*, at p. 96.) The *Garcia* court concluded that, in *Engleman* and other cases, "the reviewing court explicitly or implicitly found a lack of good cause for the continuance," affecting the weighing of the cause of the delay against prejudice, whereas in *Garcia*, there was "exceptionally good cause" for the delay. (*Garcia, supra*, at p. 251.)

Like the courts in *Breceda* and *Garcia*, we do not follow *Engleman*. The reasons stated in *Breceda* and *Garcia* are sound. But we also would note that, in our view, the *Engleman* court's reasoning is speculative in that it assumed, without apparent reliance on anything in the record, that the delay, timed as it was, "would cause the jurors to determine the case before hearing both sides." (*Engleman, supra*, 116 Cal.App.3d at p. Supp. 21.) We would not be as quick to assume a jury was unable to decide properly and impartially the case before it.

Contrary to defendant's contention, we do not find this case to be "unusually detailed and complex." Testimony took place over approximately seven days. The jury's task largely depended on its assessment of the credibility of R. and A. and whether the

jurors believed their accounts. (See *Garcia, supra*, 83 Cal.App.5th at p. 253, [case was not particularly complex; testimony only lasted eight days and the jury only had to determine whom they believed].)

We also reject defendant's contention that, as a result of the delay, the jurors would not be able to recall the details of the prosecution's case. Counsel could refresh the jurors' recollections during summations and the jury could request readbacks of testimony which, in fact, it did, requesting a readback of R.'s testimony. It would be speculative to assume the jurors would have difficulty recalling the prosecution's case. (See *Garcia, supra*, 83 Cal.App.5th at p. 253 [no evidence jurors would have trouble remembering evidence presented before the recess, "and it would have been pure speculation for the trial court to assume so"].)

Nor has defendant established any prejudice based on the substitution of two jurors (see *Breceda, supra*, 76 Cal.App.5th at p. 95 [all but one juror returned to continue proceedings]), his speculation concerning jurors' ability to see defense counsel's notes, or jurors' preoccupation with health-related concerns, of which there was no evidence (see *ibid.* [no evidence any jurors expressed any concern about the COVID-19 pandemic safety measures or feared infection because they were in a courtroom]).

We conclude that the defendant was not unfairly prejudiced as a result of the COVID-19 pandemic-related pause in trial, it did not violate his due process right to a fair trial, and the trial court did not abuse its discretion in denying defendant's motion for a mistrial.

VI

Pitchess *Motion*

*Pitchess* motions "screen[] law enforcement personnel files in camera for evidence that may be relevant to a criminal defendant's defense." (*People v. Mooc* (2001) 26 Cal.4th 1216, 1225, fn. omitted; see *Pitchess*, *supra*, 11 Cal.3d 531.) A defendant seeking discovery of a peace officer's confidential personnel record must file a written

38

motion describing the type of records or information sought (Evid. Code, § 1043, subds. (a), (b)(2)), and include with the motion an affidavit demonstrating "good cause" for the discovery and the materiality of such evidence relative to the defense (Evid. Code, § 1043, subd. (b)(3); *Mooc, supra*, at p. 1226). "If the trial court concludes the defendant has fulfilled these prerequisites and made a showing of good cause, the custodian of records should bring to court all documents 'potentially relevant' to the defendant's motion. [Citation.] The trial court 'shall examine the information in chambers' [citation], 'out of the presence and hearing of all persons except the person authorized [to possess the records] and such other persons [the custodian of records] is willing to have present' [citations]. Subject to statutory exceptions and limitations . . . , the trial court should then disclose to the defendant 'such information [that] is relevant to the subject matter involved in the pending litigation.' " (*Mooc, supra*, at p. 1226.)

Here, after trial, defendant filed a *Pitchess* motion seeking a review of the personnel records of a particular law enforcement officer. The trial court found defendant made a sufficient showing of good cause in seeking any complaint "alleging any illegal or false arrests, improper tactic, dishonesty, false imprisonment, or false police reports." The trial court conducted its in camera review and concluded there were no relevant records to disclose.

Defendant requests that we independently review the record of the trial court's in camera review to determine if the court erred in concluding the records contained nothing discoverable. The People do not oppose defendant's request.

"A trial court's ruling on a motion for access to law enforcement personnel records is subject to review for abuse of discretion." (*People v. Hughes* (2002) 27 Cal.4th 287, 330.) Having independently reviewed the record of the trial court's in camera review, we conclude the court did not abuse its discretion in concluding the records contained nothing discoverable. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 646-648.)

VII

*Cumulative Error*

Defendant asserts that, even if the trial errors did not warrant reversal individually, these errors were cumulatively prejudicial. "In examining a claim of cumulative error, the critical question is whether defendant received due process and a fair trial. [Citation.] A predicate to a claim of cumulative error is a finding of error. There can be no cumulative error if the challenged rulings were not erroneous." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.) Because we have found no error, defendant's claim of cumulative error necessarily fails.

VIII

*Ex Post Facto Laws and Counts Three and Four*

Defendant asserts the 10-year sentences imposed on counts three and four are unauthorized as ex post facto laws because those sentences exceed the maximum sentence provided for under the law in effect at the time of his offenses. The People concede the point and we agree.

"Our state and federal Constitutions prohibit ex post facto laws. [Citations.] Any law that applies to events occurring before its enactment and which disadvantages the offender either by altering the definition of criminal conduct or increasing the punishment for the crime is prohibited as ex post facto." (*People v. Rojas* (2015) 237 Cal.App.4th 1298, 1306.)

Counts three and four, charging defendant with violation of section 288, subdivision (b)(1), involved conduct alleged to have occurred between May 2007 and May 2009. At that time, the upper term for such a violation was eight years. (§ 288, former subd. (b)(1).) The upper term was increased to 10 years in 2010. (Stats. 2010, ch. 219, § 7.) Application of the new upper term of 10 years to defendant, who committed the offenses between 2007 and 2009, constituted an ex post facto application of the law. The sentences imposed on counts three and four must be vacated.

40

Moreover, "when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances.' " (*People v. Buycks* (2018) 5 Cal.5th 857, 893.)  We will remand for a full resentencing.

IX

*Senate Bill No. 567*

Defendant asserts the trial court improperly imposed upper term sentences in violation of section 1170 as amended by Senate Bill No. 567 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 731).  Because we are vacating defendant's sentence and remanding for a full resentencing, we need not address this contention.

DISPOSITION

Defendant's sentence is vacated.  In all other respects, the judgment is affirmed. We remand the matter for a full resentencing.

\s\                            ,
Krause, J.

We concur:

\s\                    ,
Robie, Acting P. J.

\s\                    ,
Feinberg, J.

41