PERREN, J.
*526 Pedro Fortin was charged with molesting two young girls. Through use of the "Abel Assessment for Sexual Interest" (Abel test), he *527 sought to prove that he does not have a sexual interest in children. He was rebuffed. The prosecution, however, was permitted to introduce evidence of the Child Sexual Abuse Accommodation Syndrome (CSAAS) to explain why child victims of sexual abuse may delay in making a report. Fortin was convicted of child molestation (Pen. Code, §§ 288, 288.7[1] ) and false imprisonment by violence (§§ 236, 237). As we shall explain, the trial court did not err in either ruling.
The Abel test results were properly excluded in the guilt phase of this criminal prosecution for want of acceptance by the relevant scientific community. Appellant's objection to the CSAAS was properly overruled once the victims' credibility was placed in issue, and its use was circumscribed by a limiting instruction. We affirm the convictions. We reverse the sentence and remand to the trial court to make a satisfactory record of the basis for its exercise of its discretion to order consecutive sentences. (§§ 667.61, 669.)
FACTS
Testimony About the Molestations
Fortin and his family lived in an apartment house in Bell Gardens. Residing in same building were Kimberly Doe and Vanessa Roe, both born in 1999 and close in age to Fortin's two daughters. The four children were friends and frequently met in Fortin's apartment, over a two-year period. Fortin sat in the living room as the children played or watched television, and was friendly with them.
Vanessa testified that when she was around seven years old, Fortin suggested that they "play doctor" while his wife was out shopping. He pretended to be a doctor and had the girls enter a bedroom to see him, one at a time. When Vanessa entered the bedroom, Fortin locked the door, pushed her onto the bed, lifted her shirt, and licked her stomach. Vanessa pushed him away and left the room. She was scared and did not know how to tell her mother what happened. Vanessa continued to visit Fortin's apartment to see his daughters, but was cautious around him.
When Vanessa was still around seven years old, Fortin scooted over to sit next to her on the sofa during a visit. His wife was in the kitchen. Fortin placed a throw pillow over Vanessa's lap, then put his hand inside of her pants and digitally penetrated her. She removed his hand; he tried to touch her again but she prevented him. Vanessa was very scared but did not tell her parents about the incident, out of concern that they would see her in a different light.
*528 Fortin complimented Vanessa but also said inappropriate things on occasion, including, "I want to make love to you." He did not try to touch her again. Vanessa remained friends with Fortin's daughters until he and his family moved away. Vanessa's mother noticed that Vanessa "was a bit scared" when she went to play with Fortin's daughters, but when asked, Vanessa said everything was okay.
Kimberly testified that when she visited Fortin's apartment at age six or seven, he approached her three or four times and said "dirty words" in her ear, meaning sexual talk. He told her that she "was old enough" and simulated fellatio. While his *870 daughters were in the kitchen, he leaned over Kimberly as she played with dolls, put his hands on her shoulders then slowly slid them down her chest and squeezed her breasts. He touched her breasts, over her clothing, on more than one occasion.
After Fortin touched her breasts, Kimberly did not feel comfortable with him. At age seven, she went to visit Fortin's daughters. When she saw her friends depart to go shopping, Kimberly began to pick up her dolls to leave. Fortin grabbed her arm forcefully, pulled her into his bedroom, and closed the door. No one else was home. He removed her shorts. When she tried to stop him, he pushed her and would not allow her to leave. Fortin unbuckled his belt, unzipped his pants, and told her to put his penis in her mouth. She said, "no." He pulled her onto the floor and forced his penis into her mouth by grasping her shoulders and jerking her head onto him. Kimberly was crying and tried to escape. Fortin warned her not to tell her mother or else he would keep doing it, which she interpreted to mean molesting her and making sexual talk. As soon as she was able to pull away, she dressed, ran home, and brushed her teeth.
Kimberly believed Fortin's threats and was scared. She did not tell her mother or her older brother. She continued to visit Fortin's apartment to play with his daughters after the oral copulation incident because she did not think that it would happen again.
A few weeks later, while his daughters were in the yard, Fortin again grabbed Kimberly's arm, took her to his bedroom, and closed the door. When she objected, he said "be quiet," and pushed her down as she tried to leave. He removed her shorts, spread her legs, and put his penis in her vagina. She was crying, scared and in pain.
As Kimberly pulled her shorts on, Fortin told her not to inform her mother what happened. Kimberly ran home and bathed because she did not want to smell Fortin's "musk" on her. Kimberly did not say anything because she was scared. Her vagina hurt for the rest of the night. After that incident, she played outside with Fortin's daughters, but never again entered his apartment.
*529 Kimberly's mother testified that Kimberly was between six and seven years old when she began playing at Fortin's apartment. One day, Kimberly came home crying, but would not say what happened. She is not a child who cries easily. After that day, her daughter did not reenter the Fortin residence.
Around the time of the molestations, Vanessa and Kimberly shared what happened with each other, but did not tell other people. After Kimberly moved away, the two girls stayed in touch through social media.
Kimberly did not want to speak to anyone about the molestations. Time had passed and she had, in her words, "already moved on." In July 2014, when Kimberly was 13, her mother chastised her for playing outside with boys (as Kimberly recalled) or because she was having problems at school (as her mother recalled). Kimberly began to cry and told her mother what Fortin had done. Kimberly explained that she was too fearful to disclose the misconduct sooner; she thought Fortin might harm her mother because he made threats.
In tears, Kimberly and her mother went to inform Vanessa's parents about the molestations. Vanessa was questioned, began crying, and admitted that Fortin had touched her. Both families reported the molestations to the police.
Expert Testimony
Clinical psychologist Jayme Jones testified for the prosecution about CSAAS
*871 and its application to situations in which the child knows the abuser. Dr. Jones listed the elements of CSAAS: (1) secrecy due to the lack of witnesses to the abuse; (2) helplessness because children are dependent and physically small; (3) accommodation to cope with ongoing abuse because children are typically taught to obey adults; (4) delayed disclosure; and (5) recanting, particularly if child welfare authorities get involved. In most cases children never disclose abuse, or disclose belatedly, or disclose in bits and pieces to see if it provokes a negative reaction in people hearing about it. The longer children hide the abuse, the guiltier they feel, making disclosure increasingly difficult. Children do not generally fabricate stories about abuse. Dr. Jones testified that CSAAS "doesn't tell us who has been abused."
A defense psychologist, Mitchell Eisen, confirmed the five elements of CSAAS, but noted that it is based on clinical observations in incest cases, not on a scientific study. He described the first three elements of CSAAS as "commonsensical." He disputed the delayed disclosure element because there is no "typical" child victim who discloses in the "typical" way suggested by CSAAS, and no evidence to support the idea that children generally delay disclosure of abuse.
*530 Clinical psychologist Roberto Flores de Apodaca, a defense expert, reviewed Fortin's personal history, sexual history, criminal history, mental health and substance abuse history, marital history, and occupational history. Dr. Flores opined that the information he collected suggested that Fortin does not have a propensity to engage in sexual acts with children.
Testimony From Fortin and His Relatives
Fortin's wife insisted that she was always present when Vanessa and Kimberly came to play, though she was sometimes busy cooking or doing laundry. Fortin was home twice a week during the day, but did not interact with the children, and typically went to visit his brother, who lived in the same complex. She opined that her husband is a hard-working, respectable man. She has never seen him act inappropriately with children. A brother-in-law similarly testified that Fortin is responsible, loving and respectful.
Fortin's daughters confirmed that their friends Kimberly and Vanessa came, two to three times per week, to play dolls and watch television in the living room of the Fortin apartment. Fortin was sometimes there, but was never alone with the girls. The children got along well and did not argue, but one day Kimberly stopped coming over to play, and, thereafter, neither did Vanessa.
Testifying on his own behalf, Fortin denied committing all of the acts described by Vanessa and Kimberly, denied being alone with them, and denied being sexually attracted to young girls. During an interview at the police station, the police used a ruse and told Fortin that his DNA was found on the victims' underwear. Fortin replied that it could not be true because he did not do anything.
The Charges, Verdict and Sentence
Fortin was charged by information with seven felonies. The jury deadlocked on counts 1 (sexual intercourse or sodomy upon Kimberly, § 288.7, subd. (a) ) and 2 (oral copulation or sexual penetration upon Kimberly, § 288,7, subd. (b)). Those counts were dismissed.
Fortin was convicted in counts 3 and 4 of committing lewd acts upon Kimberly, a child under the age of 14. (§ 288, subd. (a).) In count 7, he was convicted of sexually penetrating Vanessa, a child under the age of 10. (§ 288.7, subd. (b).) In count 8, *872 he was convicted of a forcible lewd act upon Vanessa, a child under the age of 14. (§ 288, subd. (b)(1).) In count 9, he was convicted of falsely imprisoning Vanessa by violence. (§ 236.) As to counts 3, *531 4, 7 and 8, the jury found that Fortin had substantial sexual conduct with each child. As to counts 3, 4 and 8, the jury found that Fortin committed offenses against multiple victims.
Fortin was sentenced to consecutive terms of 15 years to life on counts 3, 4, 7 and 8. The aggregate sentence was 60 years to life. A three-year term on count 9 was stayed. (§ 654.)
DISCUSSION
1. Exclusion of Abel Test Results
The trial court allowed Dr. Flores to opine that Fortin lacks sexual interest in prepubescent children, but did not allow testimony about Fortin's performance on the Abel test. The court found that the Abel test has not been adequately peer-reviewed; is not accepted in the scientific community; is designed to monitor convicted sex offenders; and is not intended for use in trials to determine a defendant's guilt or innocence. Fortin contends that excluding Abel test results violated his constitutional right to due process and to confront witnesses. He "forfeited his constitutional claims by failing to object on these grounds at trial." (People v. Carter (2003) 30 Cal.4th 1166, 1196, fn. 6, 135 Cal.Rptr.2d 553, 70 P.3d 981.)
A qualified expert may testify on a subject beyond common experience if based on material "of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject[.]" (Evid. Code, § 801, subd. (b).) The trial court has broad discretion to determine whether proposed expert testimony lacks the necessary foundation to be reliable, relevant and admissible. (People v. Lucas (2014) 60 Cal.4th 153, 226-227, 177 Cal.Rptr.3d 378, 333 P.3d 587, disapproved on other grounds in People v. Romero and Self (2015) 62 Cal.4th 1, 53, fn. 19, 191 Cal.Rptr.3d 855, 354 P.3d 983.) The court may exclude expert testimony based on unreliable material. (Sargon Enterprises, Inc. v. University of Southern California (2012) 55 Cal.4th 747, 771-772, 149 Cal.Rptr.3d 614, 288 P.3d 1237.)
Establishing reliability is the overriding factor when a party seeks to admit evidence based on a new scientific technique. (People v. Leahy (1994) 8 Cal.4th 587, 594, 34 Cal.Rptr.2d 663, 882 P.2d 321.) The courts look to see whether a new technique is " 'sufficiently established to have gained general acceptance in the particular field in which it belongs .' " (Ibid. ; People v. Kelly (1976) 17 Cal.3d 24, 30, 130 Cal.Rptr. 144, 549 P.2d 1240 ; People v. McWhorter (2009) 47 Cal.4th 318, 364-365, 97 Cal.Rptr.3d 412, 212 P.3d 692.) To be "new"-both to science and to the law-"a technique must be meaningfully distinct from existing techniques. [Citation.]"
*532 (People v. Jackson (2016) 1 Cal.5th 269, 316, 205 Cal.Rptr.3d 386, 376 P.3d 528.) The concern is that an unproven technique may appear " 'in both name and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury.' [Citation.]" (Ibid . )
California courts have yet to recognize that the Abel test may be used in cases involving sex offenses against children. "Once an appellate court has affirmed in a published opinion a trial court ruling admitting evidence based on a new scientific technique, the precedent may control future trials, at least until new evidence is presented that reflects a change in the scientific community's attitude. [Citation.]" (People v. Nelson (2008) 43 Cal.4th 1242, 1257, 78 Cal.Rptr.3d 69, 185 P.3d 49 ; see e.g., *873 People v. Jackson, supra, 1 Cal.5th at p. 320, 205 Cal.Rptr.3d 386, 376 P.3d 528 [with a proper foundation, dog scent trailing evidence can be heard by the jury because it has been admissible in California courts since 1978]; People v. Huggins (2006) 38 Cal.4th 175, 200, 41 Cal.Rptr.3d 593, 131 P.3d 995 [hair comparison evidence identifying a suspect or victim has been routinely admitted in California for many years]; People v. Wilkinson (2004) 33 Cal.4th 821, 16 Cal.Rptr.3d 420, 94 P.3d 551 [barring polygraph evidence because the scientific community deems it unreliable does not violate the defendant's federal constitutional rights].)
Dr. Flores appeared at a hearing to determine if there is an adequate foundation to admit evidence of Abel test results. (Evid. Code, § 402.) He testified that the Abel test covertly detects whether someone has persisting sexual interest in prepubescent children.[2] The state Department of Corrections recommends Abel assessments for parolees convicted of sex offenses. It has been administered over 170,000 times, has "a growing legacy," and Dr. Abel and his associates have published papers attesting to its validity and reliability. Dr. Flores conceded that the Abel test is not universally accepted and test results are not always allowed in court.
Dr. Flores acknowledged several important points, all of which undermine the evidentiary value of the Abel test. First, the Abel test assesses "persisting" interests of convicted sex offenders, and cannot be used to determine whether a person is (or is not) likely to be a sex offender. The test assumes that the person has already admitted to sexual misconduct. Second, the test has not been peer reviewed because Dr. Abel exercises proprietary rights and refuses *533 to share his formula with other scientists. Third, the scientific community does not generally accept the Abel test as a diagnostic test for pedophilia.
Dr. Flores is aware that someone facing criminal charges for molesting children would be motivated to rush through photos of underage children while the test is being administered; there is no way to avoid false negatives and false positives with the Abel test; and "there are a number of ways to thwart the test." Dr. Flores cannot interpret the test results himself. The responses must be sent to Dr. Abel in Atlanta for analysis; Dr. Flores must assume that there is no computer glitch in Atlanta and that the results are legitimate.
A defense expert may rely on an interview and his interpretation of standardized written personality tests to opine that a defendant does not show signs of "deviance." (People v. Stoll (1989) 49 Cal.3d 1136, 1140, 265 Cal.Rptr. 111, 783 P.2d 698.) In Stoll , the expert administered two standardized tests, including the Minnesota Multiphasic Personality Inventory-the most widely used psychological test in the nation-as "a springboard for a far more normative and subjective diagnostic process" leaning heavily upon patient interviews, case history, and past experience. (Id. at pp. 1147, 1159, 265 Cal.Rptr. 111, 783 P.2d 698.) The expert could proffer an ultimate opinion about Stoll because the testimony met "traditional standards for competent expert opinion." (Id . at p. 1161, 265 Cal.Rptr. 111, 783 P.2d 698.)
*874 Unlike the widely accepted standardized tests used by the expert in the Stoll case, the Abel test is a new scientific technique, process or theory. The Abel test has been deemed unreliable by the Supreme Courts of Connecticut, Maine, Montana, North Dakota and Texas.[3] It has also been rejected in federal court. (See United States v. Birdsbill (D. Mont. 2003) 243 F.Supp.2d 1128, 1132-1136, aff'd. (9th Cir. 2004) 97 Fed.Appx. 721 [Abel test is "merely an untested and unproven theory" that is "highly unreliable" due to its high error rate and susceptibility to manipulation];
*534 United States v. White Horse (D. S.D. 2001) 177 F.Supp.2d 973, 976, aff'd. (8th Cir. 2003) 316 F.3d 769, 774-775 [Abel test does not satisfy federal admissibility requirements].) A new theory that has been repeatedly rejected by courts nationwide cannot be given the imprimatur of a "routine" or accepted method of testing defendants facing criminal charges. (People v. Leahy, supra, 8 Cal.4th at p. 605-606, 34 Cal.Rptr.2d 663, 882 P.2d 321.)
The trial court did not abuse its discretion by excluding testimony about Fortin's performance on the Abel test. The courts of sister states have consistently found the Abel test to be unreliable. It has not gained acceptance as a way to prove or disprove an accused's sexual interest in children during the guilt phase of a criminal trial. Dr. Flores cast doubt on the use of the Abel test by acknowledging that the test assesses "persisting" sexual interests in convicted offenders, has not been peer reviewed, is not generally accepted in the scientific community to diagnose pedophilia, and can be thwarted by the test-taker. Under the test's user terms, Dr. Flores is not permitted to analyze or interpret Abel test results: he must send the results to Atlanta, then assumes proper analysis by Dr. Abel or trained staff and assumes the legitimacy of the results.
A proper foundation was not laid to admit Dr. Flores's proposed testimony about the Abel test, owing to the test's poor reputation for reliability in the scientific community and the witness's admitted inability to analyze the test results. Cross-examination would be thwarted by Dr. Flores's inability to explain how Fortin responded to the photo display and what this signifies. The process of analyzing responses is closely-guarded proprietary information that Dr. Abel refuses to share. Admitting the results of Fortin's Abel test would invite the jury to infer that Fortin did not molest the victims: despite its scientific name-the "Sexual Interest Assessment"- the test is not designed to determine if an accused committed a sex crime against children.
The Abel test is not the type of "professionally reasonable 'matter' " that our Supreme Court has identified as providing a solid underpinning for expert *875 opinion. (People v. Stoll, supra, 49 Cal.3d at p. 1140, 265 Cal.Rptr. 111, 783 P.2d 698.) In effect and in fact Dr. Flores would simply be a surrogate for Dr. Abel, instead of providing his " 'individual interpretation ' of the test." (Id. at p. 1149, 265 Cal.Rptr. 111, 783 P.2d 698.) California courts have long "deferred to a qualified expert's decision to rely on 'standardized' psychological tests ... to reach an opinion on mental state at the time acts were committed. [Citations.]" (Id. at p. 1154, 265 Cal.Rptr. 111, 783 P.2d 698.) Deference is not appropriate when the expert relies on the Abel test. When expert evidence is excluded because it fails to meet foundational requirements, no federal constitutional violation occurs. (People v. Ramos (1997) 15 Cal.4th 1133, 1175-1176, 64 Cal.Rptr.2d 892, 938 P.2d 950.)
[[/]]**
*535 DISPOSITION
The case is remanded to the trial court to resentence Pedro Fortin on counts 3 and 4 only, to exercise its discretion to impose concurrent or consecutive sentences, and to state on the record the reasons for its sentencing choice. In all other respects, the judgment is affirmed.
We concur:
YEGAN, Acting P.J.
TANGEMAN, J.

Unlabeled statutory references are to the Penal Code.

The test-taker's left hand is immobilized while the right hand clicks on a computer through photographs of both genders, from preschoolers to adults, clad in bathing suits. An index assesses how much time the test-taker spends on each photograph; it does not focus on how the test-taker consciously rates the images as sexually arousing or disgusting. The Abel test is never used to infer whether someone committed a particular sex act; rather, it reveals which categories provoke persisting sexual interest.

State v. Victor O. (2011) 301 Conn. 163, 20 A.3d 669, 678-679 [Abel test is "not sufficiently reliable for admission into evidence" during the guilt phase of a criminal trial because it is designed to treat known sex offenders and has a 64 percent error rate when used to detect pedophiles]; State v. Ericson (Me. 2011) 13 A.3d 777, 781-782 [Abel test is "unreliable" because it has not been peer reviewed, is not designed to detect whether a child was abused, was tested only on admitted sex offenders, and has a high error rate]; State v. Spencer (2007) 339 Mont. 227, 169 P.3d 384, 393-394 [testimony based on Abel test results was properly excluded because the expert agreed that the test was controversial, could be thwarted, and had varying success rates]; State v. Austin (N.D. 2007) 727 N.W.2d 790, 795-796 [expert testimony was properly excluded because the Abel test used to evaluate the defendant is not designed to determine whether he committed a sex crime against a child]; and In re M.P.A. (Tex. 2012) 364 S.W.3d 277, 286-289 [Abel test is unreliable and inadmissible]. See also In re Ready (2005) 63 Mass.App.Ct. 171, 824 N.E.2d 474, 476-480 [Abel test is seriously flawed and was properly excluded at trial].

See footnote *, ante.