Filed 6/3/26  P. v. Strange CA4/1
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. RUSSELL WARREN STRANGE, Defendant and Appellant. | D087347 (Super. Ct. No. RIF1805278) |

APPEAL from a judgment of the Superior Court of Riverside County, Steven G. Counelis, Judge.  Affirmed.

Wallin & Klarich and Jonathan M. Lynn for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Collette C. Cavalier and Nora S. Weyl, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Russell Warren Strange of multiple counts of lewd acts and sexual penetration with a foreign object based on his conduct with a teenage girl while serving as her high school coach and teacher.  Strange appeals on multiple grounds, none of which persuades us.

First, Strange challenges the sufficiency of the evidence supporting the guilty verdicts and the jury's finding of substantial sexual conduct necessary to toll the statute of limitations on the lewd act counts. Despite any claimed inconsistency between the guilty and not guilty verdicts, substantial evidence supported both the convicted counts and the finding of substantial sexual conduct.

Second, Strange contends the court erred in permitting an expert to testify about child sexual abuse accommodation syndrome. He claims (1) CSAAS evidence is no longer probative, as it is now "common knowledge" that victims of child sexual abuse delay disclosing their abuse; (2) the expert's CSAAS testimony was "untethered to specific case evidence"; and (3) it violated his due process rights. We are not persuaded that CSAAS evidence should be categorically excluded, as California courts permit it under binding Supreme Court caselaw and experts are permitted to opine on a matter with which the jury might have some familiarity. And any assumed error from admitting the CSAAS evidence in this case was harmless and did not violate Strange's right to due process.

Third, Strange accuses the prosecutor of committing misconduct during closing arguments. Strange forfeited these prosecutorial misconduct claims, however, by failing to object and seek to admonish the jury during trial. He has not convinced us either objection or admonishment would have been futile, as is required to overcome forfeiture.

Fourth, Strange argues a juror committed prejudicial conduct warranting a new trial when she failed to disclose her cousin's murder on a pretrial questionnaire. We defer to the trial court's credibility finding favoring the juror, and substantial evidence supports the trial court's finding

2

that the juror's omission was inadvertent.  Because Strange offers no proof of actual juror bias, we discern no error.

Fifth, Strange contends his expert should have been permitted to testify about Strange's results on the Abel test, which assesses categories of sexual interest.  He offers no supported basis for us to depart from existing caselaw precluding Abel test evidence in criminal cases involving sex offenses against children.

Sixth and finally, Strange's claim of cumulative error fails given the one assumed error was harmless.

We therefore affirm.

## I.

## A.

While in eighth grade, Jane Doe met Strange through basketball and softball programs.

In the spring of Doe's freshman year of high school, Strange coached her in varsity softball.  At this time, when Doe was 14 years old, Strange would hug her and "got more comfortable pulling [her] closer, holding onto [her] longer."  Sometimes he would drive her home after games or practice.  Strange started touching Doe's leg while in the car.  Doe described it as a "slow progression," during which he would jokingly hit her on the knee but later would keep his hand on her leg longer and "over time[]" move his hand "more up [her] leg."

That summer, Strange drove Doe to basketball practice and to practice softball pitching.  He also called her "every night."  According to Doe, at some point that summer Strange had a visible erection when he picked her up.  During another car ride, Strange put his pinky finger on the outside of Doe's vagina, touching her skin but not penetrating her.  Eventually, during these

3

car rides Strange would "aggressively" rub Doe's clitoris and "use two fingers" to penetrate her vagina.

In Doe's sophomore year, Strange was also her history teacher. Strange would digitally penetrate Doe "two to three times a week." When asked the total number of times Strange digitally penetrated her vagina between the summer after her freshman year through part of the spring of her sophomore year of high school, Doe testified that it "might be more than 50" times. She also testified about instances when she and Strange performed oral sex on each other and had sexual intercourse.

Their sexual relationship ended in the spring of Doe's sophomore year of high school, when her parents confronted her after seeing her sneak out of the house and drive away in a familiar car. Although Doe "was not going to tell them" and "really did not want to say what it was," she ultimately "came clean" and answered her parents' questions about what Strange had done to her.

Doe reported Strange's conduct to law enforcement 18 years later.

### B.

The People charged Strange with five counts of lewd acts upon a child who was 14 or 15 years old and more than 10 years younger than him (Pen. Code, § 288, subd. (c)(1); counts 1-5); five counts of oral copulation with someone under the age of 16 (§ 287(b)(2); counts 6-10); five counts of sexual penetration with a foreign object of a person under age 16 (§ 289(i); counts 11-15); and three counts of sexual intercourse with a person under age 16 (§ 261.5(d); counts 16-18).

A jury convicted Strange on all lewd act and sexual penetration counts but acquitted him on the remaining counts.

The court sentenced Strange to five years and eight months in prison.

4

II.

A.

Strange challenges the sufficiency of the evidence for his convictions and asserts "little rationale" exists for the jury to acquit him on some charges but convict on others. We conclude substantial evidence supports Strange's convictions irrespective of the jury's acquittal on some charges.

Strange views the acquitted counts as reflecting "the jury's conclusion that there was something lacking in [Doe's] testimony," which seems to feed into Strange's attack on Doe's credibility for the convicted counts. But "as a general rule, inherently inconsistent verdicts are allowed to stand." (*People v. Lewis* (2001) 25 Cal.4th 610, 656.) "An inconsistency may show no more than jury lenity, compromise, or mistake, none of which undermines the validity of a verdict." (*Ibid.*) Defendants are protected against jury irrationality or error through sufficiency of the evidence review. (*Ibid.*) Thus, even to the extent the verdicts were inconsistent, "that conclusion does not, of itself, warrant reversal." (*Ibid.*)

We review a challenge to the sufficiency of the evidence for substantial evidence. In doing so, we examine the entire record in the light most favorable to the prosecution to determine if a rational factfinder could find the essential elements of the crime beyond a reasonable doubt. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) Substantial evidence is reasonable, credible evidence of solid value, even if circumstantial. (*Ibid.*) "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify" reversal. (*People v. Maury* (2003) 30 Cal.4th 342, 403.) We will not reverse unless under "no hypothesis" whatsoever could substantial evidence support the jury's verdict. (*Zamudio*, at p. 357 [cleaned up].)

5

Strange claims "[t]his case turned on [Doe's] credibility" and focuses on Doe's mental health and her purported inability to describe a unique mark on Strange's penis, although he provides no record citation for the latter point. But we "resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." (*Maury*, 30 Cal.4th at p. 403.)

Here, Doe testified that Strange digitally penetrated her vagina perhaps more than 50 times. As the People note, that testimony "more than accounted for the five counts of lewd acts and five counts of digital penetration with a foreign object." Testimony by Doe's former softball teammate about walking into a classroom to find Strange's hand up Doe's shorts in a way that struck her as "sexual" corroborates Doe's testimony. There is more (as discussed below), but this substantial evidence suffices.

B.

Strange argues the jury's lewd act verdicts, counts 1 through 5, cannot stand because insufficient evidence supports the finding of substantial sexual conduct required to toll the statute of limitations. We disagree.

We review for substantial evidence "whether a jury properly found, by a preponderance of the evidence, that a criminal proceeding is timely under the statute of limitations." (*People v. Wong* (2010) 186 Cal.App.4th 1433, 1444.)

Section 803(f) extends the limitations period to prosecute certain sexual offenses. The current version of section 803(f) is identical to the version in effect during Strange's trial. (Former § 803(f), Stats. 2022, ch. 258, § 115.) Prosecution becomes timely if commenced within one year of the victim's report to law enforcement of certain sexual offenses that occurred when the victim was under 18 years old so long as (1) the normal limitations period has expired, (2) the crime involved substantial sexual conduct, and

6

(3) independent admissible evidence corroborates the victim's allegations. (§ 803(f)(1)-(3).)

Strange challenges only the "substantial sexual conduct" component. For tolling purposes, substantial sexual conduct means "penetration of the vagina or rectum of either the victim or the offender by the penis of the other or by any foreign object, oral copulation, or masturbation of either the victim or the offender" except for nonmutual masturbation. (§§ 803(f)(2)(B), 1203.066(b).)

Strange argues that conduct like "fondling or kissing a minor, while within the ambit of section 288, subdivision (c) if done for the purpose of sexual arousal, does not rise to the level of 'substantial sexual conduct.'" Although accurate, that statement ignores the record evidence. Doe testified that Strange digitally penetrated her vagina dozens of times. Even excluding five of those instances as the basis for the sexual penetration counts, that leaves more than enough instances of digital penetration to support the jury's finding of substantial sexual conduct to toll the statute of limitations on the five section 288(c) lewd act counts.

## C.

After Doe and a couple other witnesses testified at trial, the prosecution introduced testimony by clinical and forensic psychologist Jody Ward about CSAAS. Ward explained that CSAAS is a "pattern of behaviors many children exhibit who have been sexually abused within an ongoing relationship."

Strange contends it was error to admit Ward's CSAAS testimony because (1) such evidence is no longer probative, as it is now "common knowledge" that victims of child sexual abuse delay disclosing their abuse; (2) Ward's testimony was "untethered to specific case evidence"; and (3) it

7

violated his due process rights. We conclude (1) CSAAS evidence remains generally admissible in California courts, subject to its relevancy to the case at hand; (2) even assuming it was error to permit Ward's CSAAS testimony here, it was not prejudicial; and (3) Strange's due process rights were not violated.

CSAAS evidence serves to disabuse jurors of commonly held misconceptions or myths about how victims of child sexual abuse react. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1301.) Although inadmissible to prove sexual abuse occurred, CSAAS "is admissible to rehabilitate [the complaining] witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*Id.* at p. 1300.)

CSAAS evidence "must be tailored to the purpose for which it is being received." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 393.) Like all other evidence, it is inadmissible unless relevant. (Evid. Code, § 350.) "It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior" the CSAAS evidence is then introduced to explain. (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745.)

We review the admission of expert testimony for abuse of discretion. (*McAlpin*, 53 Cal.3d at p. 1299.)

1.

Strange asserts that "[c]ases of individuals waiting to disclose abuse are legion and are of common knowledge across our state," so no myths requiring expert CSAAS testimony remain. We are not persuaded.

In *McAlpin*, our Supreme Court emphasized that a jury need not be entirely unfamiliar with the subject of an expert's opinion to warrant its admission. (*McAlpin*, 53 Cal.3d at pp. 1299-1300.) Thus, the fact that some

8

jurors might have some general understanding about child sex abuse victims' behavior does not categorically render CSAAS evidence inadmissible.

*People v. Munch* (2020) 52 Cal.App.5th 464 considered and rejected arguments like those Strange raises now. *Munch* confirmed that *McAlpin* remains valid and binding with respect to the admissibility of CSAAS evidence, which continues to be admitted in California courts. (*Munch*, at p. 468.) While Strange points to a small handful of states that preclude some or all CSAAS evidence, "[t]hat other jurisdictions may disagree with [*McAplin*] does not change its impact on California cases." (*Ibid.*)

## 2.

Next, Strange contends the trial court erred by permitting Ward to give "a wholesale recitation of CSAAS' list of 'myths' that were untethered to specific case evidence." Even assuming error, however, it was harmless.

Strange mentions CSAAS myths generally but argues prejudice only as to delayed disclosure. He thus forfeits any claim of prejudice as to other myths. (*In re Champion* (2014) 58 Cal.4th 965, 986.) Consequently, we limit our discussion to delayed disclosure.

We apply the *Watson* standard for prejudice. (*Bowker*, 203 Cal.App.3d at p. 395.) Under this standard, we consider whether it is reasonably probable that Strange would have obtained a more favorable result absent the CSAAS evidence related to delayed disclosure. (See *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Strange claims Ward implied that "if a person has that group of [CSAAS] symptoms, then it is because they have been abused." Thus, he contends the CSAAS testimony prejudiced him by allowing the jury to conclude "abuse must have occurred" here because "children who are sexually abused delay reporting."

9

But evidence beyond the CSAAS testimony supported the jury's finding that Strange sexually abused Doe. As discussed above, Doe's teammate saw Strange with his hand up Doe's shorts in a "sexual" manner. In addition, Doe's father testified about confronting Strange the day after Doe disclosed what had been happening, during which time Strange never denied the accusation that he was "having sex" with Doe and instead responded that he "'d[id]n't know what's wrong with [him].'" And years later, during a recorded call when Doe spoke with Strange about him "having sex with [her] when [she] was a kid" and touching her "in[]appropriately," Strange did not deny her account. Instead, he apologized profusely and admitted he "live[s] with this guilt" and that he is an "awful person." On this record, it is not reasonably probable that Strange would have obtained a more favorable verdict had the CSAAS evidence been excluded.

3.

Strange further argues that admitting the CSAAS evidence violated his due process rights. This argument rests on his claim that CSAAS evidence "falls prey to [a] syllogistic fallacy." We discern no violation of his due process rights on this basis.

"[I]ntroduction of CSAAS testimony does not by itself deny [an] appellant due process." (*Patino*, 26 Cal.App.4th at p. 1747.)

According to Strange, the evidence presented an "incomplete syllogism . . . that the delay in disclosure is caused by or related to the child sexual abuse itself." But Ward cautioned the jury that CSAAS "cannot be used to diagnos[e] or determine whether or not sexual abuse occurred." On cross-examination, she confirmed that CSAAS should not be used to determine if someone has been abused and emphasized that "[w]e can't take any of these behaviors[ to] try to diagnose or determine whether or not sexual

10

abuse occur[red]." To guide the jury, the court instructed that Ward's CSAAS testimony "is not evidence that the defendant committed any of the crimes charged against him" and could be considered only in deciding if Doe's conduct "was consistent with the conduct of someone who has been molested, and in evaluating the believability of the alleged victim." (CALCRIM No. 1193.) For the first time in reply, Strange argues CALCRIM No. 1193 "needs to be rewritten to make clear that CSAAS evidence is admissible only to show that the alleged victim's behavior is *not inconsistent with* having been abused, not that it *is consistent with* being abused." This belated argument, however, is forfeited as untimely. (*People v. Tully* (2012) 54 Cal.4th 952, 1075.)

Under these circumstances, we conclude Ward's testimony did not violate Strange's due process rights.

## D.

Strange claims the prosecutor "made three improper arguments that misled the jury" by (1) arguing witness testimony of Doe disclosing Strange's actions could be independent evidence for tolling purposes, (2) arguing Doe's testimony was "'consistent'" with the CSAAS expert's testimony, and (3) paraphrasing a biblical interpretation Strange expressed on a recorded call. The People argue Strange forfeited his prosecutorial misconduct claims by failing to object during closing argument. We agree these claims are forfeited.

Prosecutors are given wide but not unlimited latitude during argument. (*People v. Ghobrial* (2018) 5 Cal.5th 250, 289.) Their conduct crosses the line to misconduct if it "'either infects the trial with such unfairness as to render the subsequent conviction a denial of due process[] or involves deceptive or reprehensible methods employed to persuade the trier of fact.'" (*Ibid.*)

11

To preserve a claim of prosecutorial misconduct, a defendant must (1) timely object and (2) ask the trial court to admonish the jury to disregard the improper argument. (*People v. Choyce* (2025) 18 Cal.5th 86, 114.) When a defendant has let purported prosecutorial misconduct pass without comment, to avoid forfeiture on appeal the defendant must show that objecting would have been futile or an admonition would not have cured the harm. (*Ghobrial*, 5 Cal.5th at p. 290.)

Strange does not assert he timely objected or sought the necessary admonition for any of these prosecutorial misconduct claims. He relies on two cases to try to avoid forfeiture without fully connecting those cases to the one before us.

In *People v. Alvarado* (2006) 141 Cal.App.4th 1577, 1581, 1585, the prosecutor improperly threw the prestige of her office behind the sole eyewitness. The prosecution's case "turned on [the witness's] credibility, making it too late for an admonition to unring the bell sounded by the prosecutor's improper attempt to bolster his credibility." (*Id.* at p. 1586.) Here, Strange fails to explain how the mention of the "fresh complaint" evidence as related to the statute of limitations or the prosecutor's paraphrasing of Strange's interpretation of the Bible improperly bolstered the credibility of any witness. As for the CSAAS-related statements, we are "unpersuaded by [Strange's] conclusory assertion that no admonition could have cured the prejudicial effect of the comments taken together." (*Ghobrial*, 5 Cal.5th at p. 290.)

In *People v. Kirkes* (1952) 39 Cal.2d 719, 726, the prosecutor's comments, amounting to "flagrant misconduct," "were interspersed throughout the closing argument in such manner that their cumulative effect was devastating"; thus, admonitions would not have cured their harmful

12

effect.  Strange claims "the prosecutor's improper remarks were similarly interspersed throughout the closing argument" here.  But without explaining how they were cumulatively "devastating," Strange has not persuaded us that objecting and seeking to admonish the jury would have been futile here, as is required to overcome forfeiture.

Accordingly, Strange has forfeited his prosecutorial misconduct claims.

## E.

Strange contends he was deprived of a fair trial when the trial court declined to remove Juror No. 8 for alleged misconduct.  We discern no abuse of discretion.

### 1.

During trial, Juror No. 8 asked if the proceedings would extend beyond a certain date and revealed that her cousin had been killed, "and one of the murderers [wa]s getting sentenced" on that date.  Yet in a pretrial questionnaire, Juror No. 8 had apparently responded "'No'" when asked if she "'or a close friend *or a relative* [have] ever been a victim of violent crimes such as murder, robbery, [domestic violence], sexual assault, [or] child abuse.'"  (Italics added.)  Defense counsel requested the trial court ask Juror No. 8 about this discrepancy.

Juror No. 8 indicated she and her cousin were not close; he was a "distant cousin" who she would see at family events, but "[h]e wasn't really around the family like that."  Her cousin had been murdered two years before the trial in another county.  Sometime after, Juror No. 8 moved in with the deceased cousin's father, her uncle.

Juror No. 8 agreed her answer to the questionnaire was "not accurate."  She explained that she "didn't think of" her cousin's murder when completing the questionnaire and that it "just passed [her] mind."  She denied being

13

intentionally untruthful. Juror No. 8 said she did not know a lot about the case against her cousin's murderer but rather only what her uncle told her. According to Juror No. 8, she "[s]ometimes" did not think about the case until her uncle informed her he was going to court for it. She reiterated that she simply "didn't think about [her cousin's] case" when responding to the questionnaire. Juror No. 8 confirmed that her cousin's experience would not, from her perspective, affect in any way her ability to be fair and impartial in Strange's case.

The trial court found Juror No. 8 credible. It concluded the inaccurate response to the questionnaire was "inadvertent" with "no intent to deceive," and thus there was no evidence of concealment implicating any bias. The court expressed it was "convinced" that Juror No. 8 "can be fair and impartial."

As a result, the court denied Strange's motion for a mistrial based on Juror No. 8's alleged misconduct.

2.

A defendant has a constitutional right to trial by an impartial jury. (*People v. Wilson* (2021) 11 Cal.5th 259, 309.) "If a juror actively conceals factual information or falsifies voir dire responses, the process of selecting jurors is undermined." (*Id.* at p. 310.)

"In the case of unintentional failure to disclose, the trial court evaluates whether a juror is so biased that they cannot perform the duties required of them." (*Wilson*, 11 Cal.5th at p. 310.) But "an honest mistake on voir dire cannot disturb a judgment in the absence of proof that the juror's wrong or incomplete answer hid the juror's actual bias." (*In re Hamilton* (1999) 20 Cal.4th 273, 300.) "[T]he juror's good faith when

14

answering voir dire questions is the most significant indicator that there was no bias." (*Ibid.*)

We review for abuse of discretion the trial court's determinations of whether a failure to disclose was intentional or resulted in juror bias. (*Wilson*, 11 Cal.5th at p. 310.) When doing so, we defer to the trial court's related credibility determinations. (*Ibid.*)

3.

The People argue Strange forfeited this argument by failing to provide record citations related to the alleged juror misconduct. California Rules of Court rule 8.204(a)(1)(C) requires each brief to "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." Strange's opening brief did not. Despite this deficiency, we elect to reach the merits.

In his opening brief, Strange accuses Juror No. 8 of "lying" and argues her "willingness to lie . . . reflected that the juror wanted to remain on this case." No evidence supports this contention. And it fails to address the trial court's findings that the lack of disclosure was inadvertent and that Juror No. 8 was credible, both which are supported by substantial evidence. In reply, Strange points to the relative recency of the cousin's murder and sentencing and claims the fact that Juror No. 8 currently lives with her cousin's father evidences "a reasonable probability of prejudice." But he offers no "proof that the juror's wrong or incomplete answer hid the juror's actual bias," so we will not disturb the judgment. (*Hamilton*, 20 Cal.4th at p. 300.)

F.

Strange argues the trial court erred by prohibiting his expert from testifying about Strange's results on the Abel test, which assesses categories

15

of sexual interest, and thus deprived him of his rights to due process, present a defense, and a fair trial.  We disagree.

Once again, the People advocate for forfeiture based on Strange's failure to include procedural background or record citations on this topic.  We decline to apply forfeiture on that basis and instead review the admissibility of the expert's testimony for abuse of discretion.  (*McAlpin*, 53 Cal.3d at p. 1299.)

"The Abel test is never used to infer whether someone committed a particular sex act; rather, it reveals which categories provoke persisting sexual interest" by assessing how much time the test-taker spends on "photographs of both genders, from preschoolers to adults, clad in bathing suits."  (*People v. Fortin* (2017) 12 Cal.App.5th 524, 532, fn. 2.)

*Fortin* excluded Abel test results in a criminal prosecution for the molestation of two young girls.  (*Fortin*, 12 Cal.App.5th at pp. 526-527.)  It observed that "California courts have yet to recognize that the Abel test may be used in cases involving sex offenses against children," as it "has not gained acceptance as a way to prove or disprove an accused's sexual interest in children during the guilt phase of a criminal trial."  (*Id.* at pp. 532, 534.)  The expert in *Fortin* conceded several points that "undermine[d] the evidentiary value of the Abel test," including that "there is no way to avoid false negatives and false positives" and the test can be thwarted multiple ways. (*Id.* at pp. 532-533.)

Strange offers us no reason to depart from *Fortin*, which bound the trial court.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  At trial, defense counsel sought to permit an expert to testify about Strange's Abel test results based on his and the expert's "understanding" that the Abel test is "accepted in the community."  But our record lacks any

16

evidence underpinning that "understanding," and on appeal Strange fails to explain how the Abel test has overcome the infirmities identified in *Fortin*. Thus, the trial court did not abuse its discretion in precluding this evidence.

As for Strange's claim that excluding the Abel test violated his constitutional rights, it is both forfeited and without merit. Strange "forfeited his constitutional claims by failing to object on these grounds at trial." (*People v. Carter* (2003) 30 Cal.4th 1166, 1196, fn. 6.) In any event, "[w]hen expert evidence is excluded because it fails to meet foundational requirements, no federal constitutional violation occurs." (*Fortin*, 12 Cal.App.5th at p. 534.)

## G.

Lastly, Strange contends the cumulative effect of these asserted errors "irreparably prejudiced his constitutional right to a fair trial." "[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) Such is not the case here, as the lone assumed error was harmless. (Accord *People v. Martinez* (2003) 31 Cal.4th 673, 697.)

## III.

We affirm.

CASTILLO, J.

WE CONCUR:

KELETY, Acting P. J.

RUBIN, J.

17